United States Court of Appeals
Fifth Circuit

**F I L E D**

**June 6, 2003**

Charles R. Fulbruge III
Clerk

**UNITED STATES COURT OF APPEALS**
**For the Fifth Circuit**

No. 02-40406

JOANNA LAXTON,

Plaintiff-Appellant,

VERSUS

GAP INC., doing business as OLD NAVY,

Defendant-Appellee.

Appeal from the United States District Court
For the Eastern District of Texas, Tyler Division

Before KING, Chief Judge, DAVIS, Circuit Judge, and VANCE*,

District Judge.

VANCE, District Judge:

*District Judge of the Eastern District of Louisiana, sitting by designation.

Plaintiff-Appellant Joanna Laxton appeals from the district court's order granting defendant-appellee Gap, Inc. judgment as a matter of law in this case brought under the Pregnancy Discrimination Act. For the following reasons, we REVERSE and REMAND.

## I.  BACKGROUND

Drawing all inferences in favor of the non-moving party, as we must when reviewing the grant of judgment as a matter of law, the factual background of this lawsuit is as follows. In March 1999, Gap recruited Laxton, the general manager of a Stein Mart department store in Tyler, Texas, to become the general manager of an Old Navy store that Gap intended to open in Tyler. Laxton had worked for Wal-Mart for eight years, climbing the management ranks and helping to open a Wal-Mart Super Center in Henderson, Texas. She then became an assistant manager for Stein Mart and was soon promoted to general manager. At first, Laxton declined Gap's offer, but Gap persisted. Only after Gap offered her $45,000 plus bonuses – $10,000 more than she made at Stein Mart – did Laxton accept. Two Stein Mart employees followed her to the new Old Navy store to become assistant managers.

After accepting the offer but before starting work, Laxton, aged 39 at the time, learned that she was pregnant. On her first day of work, March 29, 1999, she informed Lisa Haverstick, Gap's Regional Assistant Manager, of her pregnancy. She informed her

direct supervisor, Karen Jones, of her pregnancy on June 1, 1999. That was "the first real time [Laxton] was able to sit down with [Jones] and talk to her." It was also the day before the Old Navy store was due to open. Specifically, Laxton informed Jones that she was pregnant and was due around Thanksgiving. Laxton did not discuss with Jones her plans for maternity leave. She had not yet thought through the issue and was not yet familiar with Gap's maternity leave policy. Jones became visibly angry. Laxton testified that Jones "didn't appreciate the fact, I guess, that she was going to have to have someone come in during the holidays and fill in for me." Jones said, "You realize this means that I have to pull other management out of other stores to cover your store, when, basically, you know, this store should have been taken care of. What management do you think we're supposed to use?" After this conversation, Jones was "usually unpleasant" toward Laxton.

Under Laxton's management, the store timely opened on June 2, 1999. By all accounts, the store earned strong revenues. It won a national tech vest sales contest, and Laxton received monthly bonuses of over $1,000.

On July 8, 1999, the mall notified Laxton that it needed to cut power to her store between 9:00 and 10:00 p.m. The store usually closed at 9:00 p.m, after which time employees served the customers that remained in the store, closed all the registers, counted the money, and opened a back door to receive deliveries.

3

Laxton feared that problems could arise if the store's power was cut while her employees were counting money because the back door would be open for deliveries and the alarm system would be dead. She called Jones to ask for permission to close the store 30 minutes early. Jones told Laxton to keep the store open. Laxton decided to close the store early anyway. For this incident, Jones gave Laxton a "Written Warning," the first strike in Gap's "three-strikes-you're-out" policy.

On July 29, 1999, Jones and Carla Dotto, an employee at Gap's corporate headquarters, told Laxton that a "Final Written Warning" – strike two – was on its way. Mary Carr, the Zone Human Resource Manager, also played a significant role in preparing this warning. In the Final Written Warning, Gap charged Laxton with four violations of company policies and procedures: (1) exiting the store by the back door; (2) displaying unacceptable behavior toward an employee, Kerri Vallery, over the store's walkie-talkie system; (3) neglecting to inform the regional office that she had taken a sick day; and (4) hiring a bank robber. The supervisors did not discuss these charges with Laxton in the July 29 conversation. Rather, Laxton learned of the nature of the charges only when she received a copy of the Final Written Warning by fax on Saturday, August 14, 1999, which was a day off for her. The warning alarmed and frightened her, and she suspected that she was the target of pregnancy discrimination. She believed that the asserted

4

violations were false, and that she "hadn't been able to air [her] side of the story to anyone."

As to the allegation that she exited the store by the back door, Laxton testified that once she learned that this was a violation of store policy, she never did so again. As to the walkie-talkie incident, Laxton testified that Vallery had disobeyed her orders about where to place sales associates on the floor of the store. As to the sick day, Laxton testified that she called in to report the sick day, did not reach anyone, and did not leave a message because she intended to talk with headquarters again soon anyway. When she discovered that her hours for the week had been entered improperly, she made efforts to correct them. Regardless, Laxton, despite her pregnancy, was working over 70 hours a week while being paid on a salary based on 40 hours per week, and Gap produced no records indicating a problem with Laxton's overall attendance at work. Finally, Laxton testified that she never hired a bank robber. Vallery recommended that Laxton invite the job applicant to an orientation session. Before the orientation session, Laxton was "amazed" to discover through a conversation with her husband that the applicant was rumored to have robbed a bank. As soon as she discovered the problem, the applicant withdrew his application himself. At no time was the "bank robber" on Gap's payroll.

Before Laxton received the Final Written Warning on August 14, 1999, Laxton's supervisors sent Peg Inglis, a Zone Trainer,

5

to Laxton's store for a visit on August 9, 1999. Based on conversations with three of the store's four assistant managers, Inglis reported that the store suffered from low employee morale. Inglis also reported violations of store policy, including: (1) exceeding the $75 discretionary spending limit by paying $85 for pizza for employees; (2) asking two employees to wear unpurchased Old Navy tech vests during a sales promotion; and (3) failing to permit employees to take lunch breaks. Inglis's report indicates that termination was on Gap's mind, for she wrote that "if Laxton stays in position. . . ." Inglis spoke with Laxton during the store visit, but she did not raise with Laxton the issues of employee morale or the asserted violations of store policy. Instead, Inglis inquired as to Laxton's plans for maternity leave.

At trial, Laxton provided explanations for the three violations cited by Inglis: (1) she bought the pizza for employees during a busy and profitable Tax Free Weekend after Jones had directed her to "do whatever it takes" to make the weekend a success; (2) she directed two employees to wear tech vests during a nationwide tech vest sales contest that Laxton's store won and, relatedly, Gap had "sent down a directive" to have employees wear unpurchased backpacks to increase backpack sales; and (3) Laxton explained that the breaks were not recorded properly because the store's automated punch clock system was broken and employees were too busy with Tax Free Weekend to fill

6

out time sheets manually.

Laxton had previously scheduled a vacation day for Monday, August 16, 1999, the first business day for Gap after Laxton received the Final Written Warning. Gap has a "Zero Tolerance" policy against discrimination, instructing employees to call a human resources representative with concerns. Gap also makes a toll-free telephone line available for anonymous reports. On August 16, Laxton called Chazz Pono, her human resources representative, to discuss her suspicion that she was the target of pregnancy discrimination. The record reflects that Pono took no action.

On August 17, 1999, Carlos Licona, a Gap auditor, arrived at Laxton's store unannounced. Licona testified that he was not aware of Laxton's performance-related issues before his store visit. Inglis's report, however, indicated that the report would be forwarded to Licona. Licona discovered the same violations of store policy that Inglis had identified – the pizza money, the tech vests, and the lunch breaks. Like Inglis, Licona did not discuss the violations with Laxton. He instead called Carr, who, together with Dotto, directed Licona to terminate her. This was the first time that Licona, a store auditor, had ever been asked to fire an employee. Gap replaced Laxton with a male.

Laxton filed suit in federal district court on October 10, 2000, charging Gap with violating Title VII of the Civil Rights Act of 1964, as amended by the Pregnancy Discrimination Act of

1978 (the "PDA"), 42 U.S.C. § 2000e, *et seq.* The district court conducted a jury trial beginning on November 5, 2001. At the close of Laxton's case, Gap moved for judgment as a matter of law pursuant to Rule 50 of the Federal Rules of Civil Procedure. The district court denied Gap's motion. The jury returned a verdict in favor of Laxton, awarding $127,000 in back pay, $57,000 in front pay, $100,000 in mental anguish, and $200,000 in punitive damages. Gap timely filed a renewed motion for judgment as a matter of law and an alternative, conditional motion for new trial or remittitur. The district court granted the motion for judgment as a matter of law on the issue of liability and did not reach the issue of damages. The district court also granted the conditional motion for a new trial and did not reach the issue of remittitur. Laxton timely appeals.

## II.  STANDARD OF REVIEW

We review a district court's grant of judgment as a matter of law *de novo*, applying the same standard as the district court. *See Wallace v. Methodist Hospital System*, 271 F.3d 212, 218 (5th Cir. 2001). Judgment as a matter of law is appropriate if "there is no legally sufficient evidentiary basis for a reasonable jury to find for that party on that issue." FED. R. CIV. P. 50(a). This occurs when the "'facts and inferences point so strongly and overwhelmingly in favor of one party that the Court believes that reasonable men could not arrive at a contrary verdict.'"

8

*Wallace*, 271 F.3d at 219 (quoting *Rubinstein v. Adm'rs of the Tulane Educ. Fund*, 218 F.3d 392, 401 (5th Cir. 2000)); *see also Boeing Co. v. Shipman*, 411 F.2d 365, 374 (5th Cir. 1969). As we review the record, we "'must draw all reasonable inferences in favor of the nonmoving party, and [we] may not make credibility determinations or weigh the evidence.'" *Russell v. McKinney Hospital Venture*, 235 F.3d 219, 222 (5th Cir. 2000) (quoting *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 120 S.Ct. 2097, 2110, 147 L.Ed.2d 105 (2000)). We must disregard evidence favorable to the moving party that the jury is not required to believe. *See id.* The court gives credence to evidence supporting the moving party that is uncontradicted and unimpeached if that evidence comes from disinterested witnesses. *See Wallace*, 271 F.3d at 219. Finally, more than a mere scintilla of evidence is required to render the grant of judgment as a matter of law inappropriate. *See id.*

## III. ANALYTICAL FRAMEWORK

Title VII makes it unlawful for an employer "to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a). As amended by the first clause of the PDA, Title VII defines the term "because of

9

sex" as including, but not limited to, "because of or on the basis of pregnancy, childbirth, or related medical conditions." 42 U.S.C. § 2000e(k). The second clause of the PDA further provides that "women affected by pregnancy, childbirth, or related medical conditions shall be treated the same for all employment-related purposes, including receipt of benefits under fringe benefit programs, as other persons not so affected but similar in their ability or inability to work." *Id.* The Supreme Court has held that the first clause of the PDA is not limited by the specific language in the second clause. *California Fed. Sav. and Loan Ass'n v. Guerra*, 479 U.S. 272, 285, 107 S.Ct. 683, 691, 93 L.Ed.2d 613 (1987); *Newport News Shipbuilding and Dry Dock Company v. EEOC*, 462 U.S. 669, 678 n.14, 103 S.Ct. 2622, 2628 n.14, 77 L.Ed.2d 89 (1983). Congress intended the PDA to provide relief for working women and to end discrimination against pregnant workers. *See Guerra*, 479 U.S. at 286, 107 S.Ct. at 692. The PDA does not, however, "'protect a pregnant employee from being discharged for being absent from work even if her absence is due to pregnancy or to complications of pregnancy, unless the absences of nonpregnant employees are overlooked.'" *Stout v. Baxter Healthcare Corp.*, 282 F.3d 856, 860 (5th Cir. 2002) (quoting *Dormeyer v. Comerica Bank-Ill.*, 223 F.3d 579, 583 (7th Cir. 2000)); *see also Wallace*, 271 F.3d at 223 (noting that the PDA requires an employer to ignore an employee's pregnancy, but

not her absence from work, unless the employer overlooks comparable absences of non-pregnant employees).

A claim brought under the PDA is analyzed like any other Title VII discrimination claim. *Urbano v. Continental Airlines, Inc.*, 138 F.3d 204, 206 (5th Cir. 1998). Title VII discrimination can be established through either direct or circumstantial evidence. *See Wallace*, 271 F.3d at 219. Laxton's case is built on the latter, which means that it is analyzed under the familiar *McDonnell-Douglas* framework. *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). Under this framework, the plaintiff must first create a presumption of discrimination by making out a prima facie case of discrimination. *See Wallace*, 271 F.3d at 219. The burden then shifts to the employer to produce a legitimate, nondiscriminatory reason for her termination. *See id.* This causes the presumption of discrimination to dissipate. *See id.* The plaintiff then bears the ultimate burden of persuading the trier of fact by a preponderance of the evidence that the employer intentionally discriminated against her because of her protected status. *See id.*

To carry this burden, the plaintiff must produce substantial evidence indicating that the proffered legitimate nondiscriminatory reason is a pretext for discrimination. *See Reeves*, 530 U.S. at 143, 120 S.Ct. at 2106. The plaintiff must

11

rebut each nondiscriminatory reason articulated by the employer. *Wallace*, 271 F.3d at 220. A plaintiff may establish pretext either through evidence of disparate treatment or by showing that the employer's proffered explanation is false or "unworthy of credence." *Id.; Reeves*, 530 U.S. at 143, 120 S.Ct. at 2106. An explanation is false or unworthy of credence if it is not the real reason for the adverse employment action. *See Sandstad v. CB Richard Ellis, Inc.*, 309 F.3d 893, 899 (5th Cir. 2002). Evidence demonstrating that the employer's explanation is false or unworthy of credence, taken together with the plaintiff's prima facie case, is likely to support an inference of discrimination even without further evidence of defendant's true motive. *Id.* at 897; *Russell*, 235 F.3d at 223. No further evidence of discriminatory animus is required because "once the employer's justification has been eliminated, discrimination may well be the most likely alternative explanation...." *Reeves*, 530 U.S. at 147-48, 120 S.Ct. at 2108-09. The "rare" instances in which a showing of pretext is insufficient to establish discrimination are (1) when the record conclusively reveals some other, nondiscriminatory reason for the employer's decision, or (2) when the plaintiff creates only a weak issue of fact as to whether the employer's reason was untrue, and there was abundant and uncontroverted evidence that no discrimination occurred. *See Russell*, 235 F.3d at 223 (citing *Reeves*, 530 U.S. at 148, 120

12

S.Ct. at 2109); *Rubinstein*, 218 F.3d at 400.  A decision as to whether judgment as a matter of law is appropriate ultimately turns on "'the strength of the plaintiff's prima facie case, the probative value of the proof that the employer's explanation is false, and any other evidence that supports the employer's case and that properly may be considered on a motion for judgment as a matter of law.'"  *Wallace*, 271 F.3d at 220 (quoting *Reeves*, 530 U.S. at 148-49, 120 S.Ct. at 2109).

## IV.  APPLICATION OF THE ANALYTICAL FRAMEWORK

The parties do not dispute on appeal that Laxton made out a prima facie case of pregnancy discrimination.[1]  Instead, the parties dispute whether Laxton produced substantial evidence of pretext.  Evidence is "substantial" if it is "'of such quality and weight that reasonable and fair-minded men in the exercise of impartial judgment might reach different conclusions.'"  *Long v. Eastfield College*, 88 F.3d 300, 308 (5th Cir. 1996)(quoting *Boeing*, 411 F.2d at 374).

### A.  *PROFFERED LEGITIMATE REASON FOR DISCHARGE*

Gap proffers that Laxton repeatedly violated store policy

---

[1] In the district court, the parties agreed that Laxton's prima facie case required that (1) she was a member of a protected class, (2) she was qualified for the position she lost, (3) she suffered an adverse employment action, and (4) she was replaced by an employee who is not in the protected class, or, in cases of employment discipline, that others similarly situated were more favorably treated. *Joanna Laxton v. Gap, Inc.* d/b/a *Old Navy*, No. 6:00-CV-605, slip op. at 5 (E.D.Tex. Oct. 31, 2001).

13

and alienated those who worked for her, the cumulative effect of which justified her termination.  (Appellee's Brief, at 10.)  The conduct occurred over a six-week period from July 8, 1999 to August 17, 1999.  First, Gap cites the store-closing incident that took place on July 8.  Second, Gap cites the violations listed in the Final Written Warning – the back door exit, the walkie-talkie incident, the sick day, and the bank robber.  Third, Gap cites the complaints of assistant managers, primarily those reported by Inglis.  Fourth, and finally, Gap cites the alleged violations of store policy identified by Inglis and Licona – the pizza money, tech vests, and lunch breaks.  Gap asserts that Laxton's multiple violations were "too much, too soon."  (*Id.* at 26.)

*B.  EVIDENCE OF PRETEXT*

Turning to Laxton's showing of pretext, we begin by defining the contours of our inquiry.  Our inquiry is "'whether [Gap's] perception of [Laxton's] performance, accurate or not, was the real reason for her termination.'"  *Evans v. City of Houston*, 246 F.3d 344, 355 (5th Cir. 2001) (quoting *Shackelford v. Deloitte & Touche, LLP*, 190 F.3d 398, 408-09 (5th Cir. 1999)).  It is not whether Gap's proffered reason was an *incorrect* reason for her discharge.  *Sandstad*, 309 F.3d at 899.  Our concern is whether the evidence supports an inference that Gap intentionally discriminated against Laxton, an inference that can be drawn if

14

its proffered reason was not the real reason for discharge. Therefore, to survive Gap's motion for judgment as a matter of law, Laxton must produce evidence permitting the jury to disbelieve that Gap's proffered reason was its true motivation. "'The factfinder's disbelief of the reasons put forward by the defendant (particularly if disbelief is accompanied by a suspicion of mendacity) may, together with the elements of the prima facie case, suffice to show intentional discrimination.'"[2] *Reeves*, 530 U.S. at 147, 120 S.Ct at 2108 (quoting *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 511, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993)).

Laxton rebuts Gap's proffered justification for her discharge with evidence that it is false or unworthy of credence. *Wallace*, 271 F.3d at 220. She concedes that certain violations of store policy took place. She admits to closing the store early (although she testified that doing so was justified) and to exiting out the back door (although she testified that when she did so she did not know this violated store policy). Gap, however, did not terminate her for these violations. It proffers that it terminated Laxton for the "cumulative effect" of many

[2] Gap asserts that the jury may find that its proffered justification is "unworthy of credence" only if Laxton proves "mendacity." This overstates Laxton's burden. As the Supreme Court noted in *Reeves*, a plaintiff need only bring evidence that enables the jury to disbelieve that the employer's proffered justification truly motivated the adverse employment action. *Reeves*, 530 U.S. at 147, 120 S.Ct. at 2108.

violations, and Laxton casts doubt on this proffered justification in two ways.  First, she brings evidence challenging the substance of violations, *i.e.*, evidence demonstrating their falsity.  Second, she brings other evidence that undermines the overall credibility of Gap's proffered justification.

First, Laxton rebuts the substance of violations asserted by Gap, including the allegation that Laxton hired a bank robber.  Laxton invited the applicant to an orientation on the recommendation of Vallery.  Before the session, however, Laxton was "amazed" to learn through her own inquiry that the applicant was rumored to have robbed a bank.  The applicant subsequently withdrew his application and was never on Gap's payroll.

A second charge that the jury could have reasonably found to be false is that of employee complaints.  Jones testified that she made multiple calls to assistant managers and that employees lodged numerous complaints against Laxton.  Yet Gap produced no contemporaneous written documentation of any employee complaints, despite testimony that the corporation abides by rigorous record-keeping policies.  Gap did not even produce written documentation of the walkie-talkie incident referred to in the Final Written Warning.  Further, even assuming that there were complaints (such as those reported by Inglis), Laxton testified that a good, strong manager will draw employee complaints.  The walkie-talkie

16

incident presents a perfect example.  On that occasion, Vallery allegedly lodged a complaint against Laxton after being rebuked over the store's walkie-talkie system for attempting to override Laxton's decision as to where to place sales employees on the floor.  Notably, Jones, who gave Laxton a Written Warning for not following orders when Laxton closed the store early, gave Laxton a Final Written Warning for disciplining an assistant manager for not following *her* orders.  The jury may well have construed Laxton's rebuke of the assistant manager to be appropriate.  Moreoever, Laxton's ability to manage employees is corroborated by the fact that two employees followed Laxton from Stein Mart to Gap.

Laxton challenges the tech vest violation and the pizza money violation on the grounds that they involved conduct that Gap authorized and that is so trivial as to be unworthy of credence.  Gap directed Laxton to have employees wear unpurchased backpacks to increase backpack sales, but then cited Laxton for directing two employees to wear unpurchased tech vests during a tech vest sales contest in which her store placed first in the nation.  Additionally, in preparation for Tax Free Weekend, Jones directed Laxton to "do whatever it takes."  Laxton therefore exceeded her $75 discretionary spending authority by a minimal amount by spending $85 on pizza for employees.  The jury could have inferred, as did Laxton, that Jones authorized this

17

spending.

The jury could have also reasonably concluded that Laxton made an adequate effort to report her sick day. She testified that she called a supervisor that day, but that when nobody answered she did not leave a message. She testified that she attempted to correct her hours after she learned that they had been improperly entered. Finally, the jury could have reasonably concluded that Laxton permitted employees to take lunch breaks. Laxton testified that her employees took breaks but that the breaks were not recorded properly because the store's automated punch clock system was broken and employees were too busy with Tax Free Weekend to fill out time sheets manually. Further undermining this allegation is that the employees allegedly did not take lunch breaks over Tax Free Weekend, which was the same weekend that Laxton purchased pizza for lunch.

Second, in addition to her attack on the substance of these violations, Laxton brings evidence that undermines the credibility of Gap's proffered justification for her discharge. The evidence indicates that if Gap were genuinely concerned about Laxton's asserted performance-related problems, it would have permitted Laxton the opportunity to explain or to improve her conduct, but it did not do so. Jones testified to the common sense notion that, from a business standpoint, it makes sense to try to utilize corrective action with an under-performing general manager before firing her. Yet, as the alleged violations of

18

store policy occurred, Laxton's supervisors, including Jones, Carr and Dotto, did not discuss them with her. Supervisors discussed only a single employee complaint with her – the arguably justified walkie-talkie incident. Notably, no supervisor ever discussed with Laxton the problem of lunch breaks, which Carr testified was of particular concern to the company. Laxton did not even receive a copy of the Final Written Warning until Saturday, August 14, just one working day before her discharge. Perhaps most telling in this regard was Inglis's store visit. During the visit, Inglis failed to discuss with Laxton the "serious" problems of employee morale that she discovered. Instead, Inglis discussed Laxton's plans for maternity leave.

Only six weeks elapsed between Laxton's first Written Warning and her termination, and during that time her supervisors never gave her the chance to explain her conduct or improve it. Had Gap bothered to do so, progress might have been made. For example, as soon as Laxton learned that exiting by the back door violated store policy, she did not do so again.[3]

---

[3] The district court reduced Laxton's showing of pretext to the argument that Gap violated its own corrective action policy, which calls on supervisors to discuss violations of store policy with the employee. The district court noted, correctly, that an employer's disregard of its policies "does not of itself conclusively establish that. . . a nondiscriminatory explanation for an action is pretextual." *EEOC v. Texas Instruments Inc.*, 100 F.3d 1173, 1182 (5th Cir. 1996). Laxton, however, does not assert that Gap's failure to follow its own policy is *of itself* evidence of pretext. Rather, Gap's failure to discuss alleged

Further, the jury may have determined that Gap's witnesses lacked credibility.  The record indicates that Jones may have come across as a difficult witness and that Licona was not credible.  Licona testified that he did not know that Laxton was pregnant on the day that he terminated her.  On that day, Laxton was visibly pregnant, as a contemporaneous photograph confirms.  Licona also identified handwriting on his store visit log as that of Laxton, from which the jury could have inferred that Laxton was on notice of the violations that he found.  Laxton, however, denied that it was her handwriting, and her testimony was corroborated by that of an assistant manager who testified that it was *her* handwriting and not Laxton's.  Finally, Licona testified that he did not see a copy of Inglis's report before he visited Laxton's store.  The jury may have reasonably inferred that he had seen a copy because the report indicated that a copy should be forwarded to him and because he identified the exact violations of store policy that Inglis cited in the report.

Upon consideration of all of the evidence, the jury may have reasonably concluded that Jones, Carr and Dotto solicited and exaggerated complaints from Laxton's assistant managers, issued a Written Warning and a Final Written Warning, and dispatched

----

violations with a recently-hired general manager of a successful store despite its admission that this makes business sense casts doubt on its proffered reason *regardless* of Gap's policy in this regard.  That Gap violated its own policy to that effect is merely icing on the cake.

Inglis and Licona for store visits in an effort to compile a laundry list of violations to justify a predetermined decision to terminate Laxton. This would explain why Gap asserted some violations that are false and others that involved conduct that was arguably authorized. It would also explain why Gap, a company whose goal is to earn a profit, took issue with conduct like the tech vests and the pizza money that helped it to achieve its overarching goal. It would also explain Inglis's revealing statement in her report that "if Laxton remains in position. . . ." Finally, it would explain why Gap rushed to fax Laxton a copy of the Final Written Warning on Saturday, August 14, which was a day off for Laxton. The jury may have inferred that Gap wanted Laxton to have the warning in hand before Licona's store visit on August 17, 1999, because Gap knew that it was going to terminate Laxton on that day regardless of what violations Licona discovered.

Gap's proffered justification becomes even less credible when viewed in light of the strength of Laxton's prima facie case. The factfinder may consider evidence establishing Laxton's prima facie case, as well as inferences properly drawn therefrom, in its determination of whether Gap's proffered explanation is pretextual. *Reeves*, 530 U.S. at 143, 120 S.Ct. at 2106. Part of Laxton's prima facie case is that she was qualified for the position of general manager. Before joining Gap, she had a

21

successful career in retail with Wal-Mart and Stein Mart. When Gap recruited Laxton away from Stein Mart to open the new Old Navy store, Laxton declined. Only after Gap offered her a considerable raise did Laxton accept. Laxton's store opened on time and, under her direction, earned strong revenues. Gap rewarded her with monthly bonuses of over $1,000. By mid-August, when she was fired, the store had already surpassed the month's quota to qualify for a bonus. In short, the store had just opened, Laxton was working more than 70 hours a week, and she was instructed by her supervisors to do whatever it takes. If the store's revenues are any indication, that is exactly what she was doing. It was a stressful but successful environment. Yet, despite Laxton's qualifications as a general manager and despite her success in making the new Old Navy store profitable, Gap proffers that it terminated her for a laundry list of questionable violations, virtually none of which Gap bothered to discuss with her. Conveniently, Gap left itself just enough time to permit a new general manager to settle into the job before the busy holiday season. Based on the evidence presented, the jury could have reasonably concluded that Gap's proffered reason for discharge was not its real reason.

C. *ADDITIONAL EVIDENCE OF DISCRIMINATION*

Although Laxton's showing of pretext is, under *Reeves*, sufficient for her to survive Gap's motion for judgment as a

matter of law, she supplements her case of discrimination with an oral statement of her supervisor, Karen Jones.  When Laxton informed Jones that she was pregnant and was due around Thanksgiving, Jones became visibly angry.  Laxton testified that Jones "didn't appreciate the fact, I guess, that she was going to have to have someone come in during the holidays and fill in for me."  Jones said, "You realize this means that I have to pull other management out of other stores to cover your store, when, basically, you know, this store should have been taken care of.  What management do you think we're supposed to use?"

An oral statement exhibiting discriminatory animus may be used to demonstrate pretext or, as is the case here, it may be used as additional evidence of discrimination.  *Russell*, 235 F.3d at 225.  The remark must, first, demonstrate discriminatory animus and, second, be made by a person primarily responsible for the adverse employment action or by a person with influence or leverage over the formal decisionmaker.[4]  *Id.; see also Sandstad*, 309 F.3d at 899.

---

[4] Before *Reeves*, this court applied the four-part test articulated in *Brown v. CSC Logic, Inc.*, 82 F.3d 651 (5th Cir. 1996), to determine whether a remark constitutes evidence of discrimination.  We continue to apply the *CSC Logic* test when a remark is presented as direct evidence of discrimination apart from the *McDonnell-Douglas* framework.  *See Auguster v. Vermilion Parish Sch. Bd.*, 249 F.3d 400, 404-05 (5th Cir. 2001). Citing *Reeves*, however, the *Russell* court did not apply the *CSC Logic* test to a remark introduced as additional evidence of discrimination.  *Russell*, 235 F.3d at 226.

As to the first inquiry, the jury is permitted to infer discriminatory animus from Jones's remark.  In *Maldonado v. U.S. Bank*, 186 F.3d 759, 767 (7th Cir. 1999), the plaintiff notified her employer that she was pregnant and that she was due to give birth during the busy summer months.  Her employer terminated her the next day.  The employer proffered that it fired her not because she was pregnant, but because her pregnancy-induced absence would make her unavailable to work at a busy time.  After noting that the PDA permits an employer to fire a pregnant employee for excessive absenteeism, the Seventh Circuit held that the PDA bars an employer from discharging an employee based on an unjustified presumption that the employee's pregnancy will render her unable to fulfill her job expectations.  The *Maldonado* court held that an employer cannot take anticipatory action unless it has "a good faith basis, supported by sufficiently strong evidence, that the normal inconveniences of an employee's pregnancy will require special treatment."  *Maldonado*, 186 F.3d at 767; *see also Troy v. Bay State Computer Group, Inc.*, 141 F.3d 378, 381 (1st Cir. 1998) (affirming jury verdict in favor of terminated pregnant employee where employer might have acted on unlawful, stereotypical speculation that pregnant women are poor attendees); *Deneen v. Northwest Airlines, Inc.*, 132 F.3d 431, 437 (8th Cir. 1998) (affirming jury verdict in favor of terminated pregnant employee where employer may have "discriminatorily

24

assumed [the plaintiff] was suffering a condition that would interfere with her job"). When Jones made her remark on June 1, she did not know what the impact of Laxton's pregnancy would be. Not even Laxton knew, as she "really hadn't given [maternity leave] a lot of thought because we were just trying to make it through getting the store opened." She was not yet familiar with Gap's maternity leave policy. It is reasonable to infer from Jones's negative reaction to the news of Laxton's pregnancy that she harbored a stereotypical presumption about Laxton's ability to fulfill job duties as a result of her pregnancy. Gap's reliance on *Wallace* is off-the-mark, for in that case the employee's supervisor expressed frustration with the employee's third pregnancy, stating that "I don't know how to classify you because you were gone three months and you'll be gone three months again." *Wallace*, 271 F.3d at 222. By contrast, Jones had no knowledge as to how long Laxton would take maternity leave. Discriminatory animus can be inferred from Jones's willingness to assume the worst.

As to the second inquiry, Laxton produced sufficient evidence to enable the jury to conclude that Jones influenced Carr and Dotto, the individuals principally responsible for the adverse employment action. Courts do not "blindly accept the titular decisionmaker as the true decisionmaker." *Russell*, 235 F.3d at 227. Rather, the discriminatory animus of a manager can

25

be imputed to the ultimate decisionmaker if the decisionmaker "acted as a rubber stamp, or the 'cat's paw,' for the subordinate employee's prejudice." *Id.* (citing *Shager v. Upjohn, Co.*, 913 F.2d 398, 405 (7th Cir. 1990)). The relevant inquiry is whether Jones "had influence or leverage over" Carr and Dotto's decisionmaking. *Id.* at 226. Jones issued Laxton's Written Warning. Carr issued Laxton's Final Written Warning, but Carr testified that Jones served as her primary source of information. Gap makes the somewhat implausible assertion that Carr and Dotto did not rely on the two warnings when they decided to terminate Laxton, but instead relied solely on the "independent investigations" of Inglis and Licona. This position is inconsistent with Gap's proffered justification for Laxton's discharge, namely, the cumulative effect of violations of company policy including those cited in the Written Warning and Final Written Warning. The degree to which Carr and Dotto relied on the "independent investigations" is a question of fact for the jury. *Mato v. Baldauf*, 267 F.3d 444, 450 (5th Cir. 2001). Given that the Written Warning and the Final Written Warning represent Strikes One and Two in Gap's "three-strikes-you're-out policy," the jury could have reasonably concluded that these warnings influenced Carr and Dotto's decisionmaking.

Gap's reliance on *Wallace* for the proposition that Jones did not influence the final decisionmakers is, again, off-the-mark.

26

Like Jones, the declarant in *Wallace* was the terminated employee's direct supervisor.  Also like Jones, the *Wallace* declarant participated in the factfinding leading to the plaintiff's termination.  In both cases, the supervisors' discriminatory animus arguably colored their factfinding.  The final decisionmakers in *Wallace*, however, did not rely on the *Wallace* declarant's factfinding to terminate the plaintiff because the plaintiff in that case freely admitted to the final decisionmakers that she committed the violation for which they fired her.  *Wallace*, 271 F.3d at 218.  Here, by contrast, Laxton never admitted to Carr and Dotto that she committed the violations charged in the Final Written Warning.  Indeed, Carr herself testified that she relied on Jones for the facts underlying these violations.  The jury could have therefore reasonably inferred that Jones "had influence or leverage over" Carr and Dotto, such that it would have been proper for the jury to impute Jones's discriminatory animus to Carr and Dotto.  *Russell*, 235 F.3d at 226.

   *D.  MORE THAN A MERE SCINTILLA*

   We find that the parties presented the jury with two competing versions of Laxton's termination.  Laxton produced evidence of pretext and a discriminatory remark from which the jury could reasonably infer that intentional discrimination took place.  This is legally sufficient evidence that amounts to more

27

than a mere scintilla.  It is the province of the jury to judge the credibility of witnesses and resolve conflicts in the evidence, and we will not second-guess its rejection of Gap's proffered justification.  *Russell*, 235 F.3d at 225.

Gap asserts that Laxton's case must fail because she produced no evidence that discriminatory animus motivated her termination.  Since *Reeves*, however, when a plaintiff makes a sufficient showing of pretext, no further evidence of discriminatory animus is required to withstand a motion for judgment as a matter of law.  *Reeves*, 530 U.S. at 147-48, 120 S.Ct. at 2108-09.  This is not a "rare" exception to *Reeves* where (1) the evidence conclusively reveals some other, nondiscriminatory reason for the discharge or (2) the plaintiff's showing as to pretext is weak and the employer brings "abundant and uncontroverted" evidence that its decision was not motivated by discriminatory animus.  *Russell*, 235 F.3d at 223; *see also Price v. Fed. Express Corp.*, 283 F.3d 715, 723 (5th Cir. 2002) (dicta); *Rubinstein*, 218 F.3d at 400.  The first exception does not apply because the evidence does not conclusively reveal some other reason for discharge.  The second exception does not apply because Laxton's showing of pretext is not weak.  Further, there is not "abundant and uncontroverted" evidence that there was no discrimination.  Gap asserts that the number of supervisors identifying Laxton's performance-related problems mitigates

against the possibility that Gap's decision was discriminatory. Although this may be true, it is insufficient to warrant a departure from *Reeves*.

Gap makes two additional arguments that are equally unavailing. First, Gap asserts that Carr, a key final decisionmaker, did not know that Laxton was pregnant. This argument is flatly contradicted by Carr's own testimony that she reviewed Inglis's report, in which Laxton's plans for maternity leave were discussed. (We note that Gap's position in this regard contradicts its earlier position that Carr relied entirely on the independent investigations of Inglis and Licona and did not rely on Jones.) Second, and finally, Gap asserts that Laxton's case amounts to impermissible second-guessing of its business judgment. *See Mato*, 267 F.3d at 452 (noting that anti-discrimination laws are not vehicles for judicial second-guessing of business decisions). Were Laxton to assert that Gap *should not* have terminated her for the cumulative effect of her violations, she would be second-guessing its business judgment. But that is not Laxton's argument. Instead, she brings evidence that Gap *did not* terminate her for that reason. This argument does not impermissibly challenge Gap's business judgment. It permissibly challenges Gap's credibility.

Ever mindful of the recent mandate of *Reeves* "not to substitute [the court's] judgment for that of the jury and not to

unduly restrict a plaintiff's circumstantial case of discrimination," *Russell*, 235 F.3d at 223 n.4, we conclude that "[Gap's] evidence is not of such magnitude that a reasonable jury could *only* find in their favor." *Id.* at 225. Accordingly, we reverse the district court's grant of judgment as a matter of law on the issue of liability.

In the district court, Gap moved for judgment as a matter of law on each of the three types of damages awarded: punitive damages, mental anguish, and back pay and front pay. The district court did not reach these arguments and the parties do not urge us to decide them on appeal.[5] We therefore remand to the district court to address whether the evidence supports the jury's damage awards.[6]

## V. MOTION FOR NEW TRIAL OR REMITTITUR

Gap moved for a new trial or, in the alternative, remittitur. This court has held that when a jury verdict results from passion or prejudice, a new trial is the proper remedy. *Brunnemann v. Terra Int'l., Inc.*, 975 F.2d 175, 178 (5th Cir. 1992). When a damage award is merely excessive or so large as to

---

[5] Aside from jurisdictional questions, we do not generally consider arguments that have not been urged by the parties on appeal. *Crowe v. Smith*, 151 F.3d 217, 237 n.30 (5th Cir. 1998).

[6] Our determination as to liability should not be construed to suggest that the evidence supports an award for punitive damages. *See, e.g., Kolstad v. Am. Dental Ass'n*, 527 U.S. 526, 119 S.Ct. 2118, 144 L.Ed.2d 494 (1999); *Hardin v. Caterpillar, Inc.*, 227 F.3d 268 (5th Cir. 2000).

appear contrary to right reason, remittitur is the appropriate remedy. *See id.* The district court below granted Gap's motion for a new trial and did not reach the issue of remittitur. *Joanna Laxton v. Gap, Inc. d/b/a Old Navy*, No. 6:00-CV-605 (E.D.Tex. Mar. 1, 2002).

The grant of a new trial is reviewed for abuse of discretion. *See Thomas v. Texas Dep't of Criminal Justice*, 297 F.3d 361, 368 (5th Cir. 2002). A decision to grant a new trial is, however, accorded less deference than a decision denying the grant of a new trial. *See Brady v. Fort Bend Cty.*, 145 F.3d 691, 713 (5th Cir. 1998). Courts grant a new trial when "'it is reasonably clear that prejudicial error has crept into the record or that substantial justice has not been done.'" *Sibley v. Lemaire*, 184 F.3d 481, 487 (5th Cir. 1999) (quoting *Del Rio Distributing, Inc. v. Adolph Coors Co.*, 589 F.2d 176, 179 n.3 (5th Cir. 1979)). In granting a new trial, the district court weighs all of the evidence, and it need not view it in the light most favorable to the nonmoving party. *See Smith v. Transworld Drilling Co.*, 773 F.2d 610, 613 (5th Cir. 1985). A new trial is warranted if the evidence is against the great, and not merely the greater, weight of the evidence. *See Shows v. Jamison Bedding, Inc.*, 671 F.2d 927, 930 (5th Cir. 1982).

The district court granted Gap's motion for a new trial for two reasons. First, the district court found that Laxton "failed

to rebut the nondiscriminatory reasons for her termination advanced by [Gap] by pointing to departures from company policy." *Joanna Laxton v. Gap, Inc. d/b/a Old Navy*, No. 6:00-CV-605 at 3 (E.D.Tex. Mar. 1, 2002). We have already determined that Laxton did indeed rebut the proffered nondiscriminatory reason for her termination. Second, the district court found that Laxton did not show that pregnancy-based animus motivated the alleged departures from company policy. In light of Laxton's showing of pretext and the Supreme Court's decision in *Reeves*, the district court's insistence on evidence of discriminatory animus constitutes an abuse of discretion. *Reeves*, 530 U.S. at 147-48, 120 S.Ct. at 2108-09; *Sandstad*, 309 F.3d at 897. We therefore reverse the district court's grant of a new trial.[7]

## VI. CONCLUSION

The district court's grant of judgment as a matter of law and its grant of a new trial are reversed. We remand for proceedings consistent with this opinion.

REVERSED.

---

[7] The district court did not reach the issue of a remittitur, but may do so on remand pending its determination of Gap's motion for judgment as a matter of law on the damage awards.

32