# United States Court of Appeals for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**

March 6, 2024

Lyle W. Cayce
Clerk

No. 23-30093

David Flettrich,

*Plaintiff—Appellant*,

*versus*

Chevron Oronite Company, L.L.C.,

*Defendants—Appellee*.

Appeal from the United States District Court
for the Eastern District of Louisiana
USDC No. 2:21-CV-1986

Before Richman, *Chief Judge*, Stewart, *Circuit Judge*, and Hanks, *District Judge*.[*]

Per Curiam:[**]

In this wrongful termination case, a former employee seeks reversal of the district court's grant of summary judgment for the employer and its denial of the former employee's motion to alter judgment. We AFFIRM.

---

[*] United States District Judge for the Southern District of Texas, sitting by designation.

[**] This opinion is not designated for publication. *See* 5th Cir. R. 47.5.

No. 23-30093

## PROCEDURAL BACKGROUND

David Flettrich worked for Chevron Oronite Company, LLC ("Chevron") from 2007 until he was terminated on October 15, 2020. At the time he was terminated, he was one of eight maintenance team leaders ("MTLs"), all of whom were supervised by Fallon Martin.

*—Reduction of MTL positions and distribution of job responsibilities*

In June or July of 2020, Martin received word that the eight MTL positions would be reduced to six. The employees, including Flettrich and his co-worker Jerry Ockmand, were told to reapply for their jobs.

Flettrich, who is White, contends that "[a]fter his termination, [his] MTL job duties were assumed by Daniel Johnson, a Black male, and William Sorto, a Hispanic male." Martin, on the other hand, explained that after the MTL positions were reduced from eight to six, he looked at what the responsibilities were for those two particular positions, looked at the other six positions that were going to remain, and decided "what made sense of those other folks picking up those other responsibilities, including myself as a supervisor." He explained that Flettrich's position "was eliminated and then responsibilities [were] consolidated to some other MTLs," including Will Sorto, Daniel Johnson, and Gene Quave.

*—Reports that Flettrich used racial language and investigation*

In July 2020, Matt Yarborough, a human resources business partner at the plant where Flettrich worked, had a discussion with Flettrich because an anonymous green "Triangle of Prevention" card had been submitted, which, according to Yarborough, stated "something like . . . a person uses . . . racial language in the workplace. And then somewhere else on the card it had David Flettrich's name." Yarborough said the card was "kind of vague." Yarborough showed Flettrich the card and asked him if he had any idea why

his name would be on a card "or something like that." After Flettrich said he did not, Yarborough said "something like . . . if there's any reason anybody's got this perception of you, you probably want to clean that up. And it would be . . . a violation of policy to use language like that." Yarborough did not think the meeting lasted more than five minutes.

On August 10, 2020, during a Performance Improvement Plan meeting with Martin and another Chevron employee, Ockmand alleged that Flettrich had used a racial slur, the n-word, in either October 2019 or May or June 2020. According to Ockmand, Flettrich "walked into the office and called the scaffold builders a bunch of stupid [f-word] [n-word]." A Chevron employee relations counselor in Houston, Texas, Jeff Trader, investigated the complaint.[1] Over the course of the investigation, he interviewed 11 witnesses and Flettrich and reviewed various documents they provided. While Ockmand did not hear Flettrich use the n-word at any other time and no one else was present at the time, Trader found that Ockmand had told "at least five co-workers about the incident" though they all had different recollections about when exactly Ockmand had told them about the incident, with dates ranging from November 2019 to May 2020. The head mechanic, Mike Peco, told Trader he had heard about the n-word incident from Ockmand and that he had also had a similar experience in late December 2019 or early January 2020. Specifically, he said Flettrich told him, in referring to an A/C crew: "These [n-word] are driving me crazy because they don't record anything." A co-worker corroborated being told about the incident by the head mechanic.

---

[1] Trader explained that Employee Relations conducts neutral fact-finding investigations but does not determine disciplinary action.

In addition, Trader explained in his investigation report that a witness told him about other incidents involving Flettrich using the n-word: "One witness told me that he has been told by two separate contractors (both Black) that they have heard Mr. Flettrich use the word '[n-word]' in their presence. One member of the labor crew told this witness that he had overheard Mr. Flettrich talking to a White contractor about the labor crew, which is all Black. Mr. Flettrich said, 'They ain't nothing but a bunch of [n-word]' and 'Them [n-word] don't do nothing.' The witness also told me a member of the scaffold crew told him he had overheard Mr. Flettrich talking to a White contractor about the crew and had referred to them as '[n-word].'"

Mr. Flettrich denied that he used the n-word. Trader concluded that while "Mr. Flettrich seemed credible in his *inability to remember* using the [n]-word in conversation, evidence suggests that he has used it at least twice in conversation with Whites, but outside the presence of Black people, in the last year." He determined that Ockmand was "reasonably and actually offended by Mr. Flettrich's use of a racial slur in the workplace, in violation of HR Policy 420 — Harassment in the Workplace." Policy 420 defines "prohibited harassment" to include "slurs, jokes, insults, epithets, gestures, or teasing." In "cases where it may be inappropriate or uncomfortable to confront the harasser" the policy directs individuals to "immediately make a verbal or written complaint" to, *inter alia*, the immediate supervisor or the company Hotline. It further provides that upon "receipt of a complaint of harassment, company representatives will conduct an immediate and appropriate investigation. Managers and supervisors will take appropriate corrective action upon completion of the investigation and evaluation of results."

Trader reported the results of his investigation in an October 5, 2020, report to an HR manager. Flettrich was terminated as a result of the investigation. Flettrich alleged that he was given a Record of Discussion

document at the time of his termination which stated that Chevron had substantiated that on more than one occasion and according to more than one witness, Flettrich had used a racial slur—the n-word—to describe a group of contract workers. Martin explained that he was upset when Flettrich was terminated. The two of them had a relationship outside the Chevron facility and had even played softball together previously. But Martin stated that he believed Chevron handled the situation properly.

* * *

Flettrich filed the instant lawsuit on October 5, 2021, and Chevron removed it to district court. The district court dismissed his claims against Ockmand and all his remaining claims except for his claim for discrimination under the Louisiana Employment Discrimination Law. Chevron filed a motion for summary judgment on that claim, which the court granted. The court also denied Flettrich's subsequent motion to alter the judgment.

## LEGAL STANDARDS

### —*Summary judgments*

We review de novo a district court's grant of summary judgment, viewing all facts and evidence in the light most favorable to the nonmovant. *E.E.O.C. v. LHC Group, Inc.*, 773 F.3d 688, 694 (5th Cir. 2014). The initial burden falls on the movant to identify areas essential to the nonmovant's claim in which there is an absence of a genuine issue of material fact. *Lincoln Gen. Ins. Co. v. Reyna*, 401 F.3d 347, 349 (5th Cir. 2005). The movant, however, need not negate the elements of the nonmovant's case. *See Boudreaux v. Swift Transp. Co.*, 402 F.3d 536, 540 (5th Cir. 2005). The movant may meet its burden by pointing out the absence of evidence supporting the nonmovant's case. *Duffy v. Leading Edge Prods., Inc.*, 44 F.3d 308, 312 (5th Cir. 1995).

If the movant meets its initial burden, the nonmovant must go beyond the pleadings and designate specific facts showing that there is a genuine issue of material fact for trial. *Littlefield v. Forney Indep. Sch. Dist.*, 268 F.3d 275, 282 (5th Cir. 2001). "An issue is material if its resolution could affect the outcome of the action. A dispute as to a material fact is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *DIRECT TV Inc. v. Robson*, 420 F.3d 532, 536 (5th Cir. 2006) (citations omitted).

Factual controversies are resolved in favor of the nonmovant "only when both parties have submitted evidence of contradictory facts." *Alexander v. Eeds*, 392 F.3d 138, 142 (5th Cir. 2004) (citation and quotation marks omitted). The nonmovant's burden is not met by mere reliance on the allegations or denials in the nonmovant's pleadings. *See Diamond Offshore Co. v. A & B Builders, Inc.*, 302 F.3d 531, 545 n.13 (5th Cir. 2002). Likewise, "conclusory allegations" or "unsubstantiated assertions" do not meet the nonmovant's burden. *Delta & Pine Land Co. v. Nationwide Agribusiness Ins. Co.*, 530 F.3d 395, 399 (5th Cir. 2008). Instead, the nonmovant must present specific facts which show the existence of a genuine issue concerning every essential component of its case. *Am. Eagle Airlines, Inc. v. Air Line Pilots Ass'n, Int'l*, 343 F.3d 401, 405 (5th Cir. 2003). In the absence of any proof, the court will not assume that the nonmovant could or would prove the necessary facts. *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (en banc).

— *The LEDL*

Before the district court, Flettrich "confirmed that his lawsuit concerns state law claims only." Specifically, Flettrich pled claims for racial discrimination under La. R.S. § 23:332, the Louisiana Employment Discrimination Law ("LEDL"). "Claims of racial discrimination in

employment [under the LEDL] are governed by the same analysis as that employed for such claims under Title VII" of the 1964 Civil Rights Act. *DeCorte v. Jordan*, 497 F.3d 433, 437 (5th Cir. 2007). Where a plaintiff does not provide direct evidence of discrimination, Title VII claims proceed under the *McDonnell Douglas* framework. *See McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802–05 (1973). The parties agree that the *McDonnell Douglas* analysis is appropriate here.

"Analysis under the well-established *McDonnell Douglas* framework proceeds as follows: (1) the plaintiff must first establish a prima facie case of discrimination; (2) the burden then shifts to the defendant to provide a legitimate, nondiscriminatory reason for the employment action; and if that burden is satisfied, (3) the plaintiff must offer evidence that the proffered reason is a pretext for racial discrimination." *Knatt v. Hosp. Serv. Dist. No. 1 of E. Baton Rouge Par.*, 327 F. App'x 472, 482 (5th Cir. 2009) (unpublished). To establish a prima facie case under the *McDonnell Douglas* framework, Flettrich was required to show the district court that: (1) he is a member of a protected class; (2) he was qualified for his position; (3) he was subject to an adverse employment action; and (4) he was replaced by someone outside of his protected class or treated less favorably than "similarly situated" employees who were not members of his protected class. *Bryan v. McKinsey & Co.*, 375 F.3d 358, 360 (5th Cir. 2004). Once a plaintiff establishes a prima facie case of discrimination, a presumption of discrimination arises, *Laxton v. Gap Inc.*, 333 F.3d 572, 578 (5th Cir. 2003), and the burden of production of evidence shifts to the employer to "articulate a legitimate, nondiscriminatory reason for the adverse employment action." *Cannon v. Jacobs Field Servs. N. Am., Inc.*, 813 F.3d 586, 590 (5th Cir. 2016).

If the employer meets its burden of production, "the presumption of discrimination disappears[.]" *Watkins v. Tregre*, 997 F.3d 275, 282 (5th Cir. 2021) (quotation marks omitted). The burden then shifts to the plaintiff to

"produce substantial evidence indicating that the proffered legitimate, nondiscriminatory reason is a pretext for discrimination." *Id.* (quotation marks and brackets omitted). "A plaintiff may establish pretext either through evidence of disparate treatment or by showing that the employer's proffered explanation is false or 'unworthy of credence.'" *Thomas v. Johnson*, 788 F.3d 177, 179 (5th Cir. 2015) (quoting *Laxton*, 335 F.3d at 578).

## ANALYSIS

The district court concluded that Flettrich failed to establish a genuine issue of material fact on the issue of pretext. We agree. Accordingly, assuming without deciding that Flettrich established a prima facie case of discrimination,[2] we conclude that the district court properly granted summary judgment for Chevron.

When a plaintiff makes out a prima facie case, the employer must produce a legitimate nondiscriminatory reason for its action. *Laxton*, 333 F.3d at 578. "This burden on the employer is only one of production, not persuasion, involving no credibility assessments." *Russell v. McKinney Hospital Venture*, 235 F.3d 219, 222 (5th Cir. 2000). Chevron presented evidence to the district court showing that it believed, based on Trader's

---

[2] We recently held that "[a]n employee has not been replaced when his former duties are distributed among other co-workers." *Ernst v. Methodist Hosp. Sys.*, 1 F.4th 333, 339 (5th Cir. 2021) (quotation marks omitted). However, a footnote in *Ernst* suggests that a plaintiff can establish a prima facie case of discrimination by showing that the other co-workers among whom the plaintiff's former duties were distributed were all outside of the plaintiff's protected class. *See id.* at 339 n.5 (distinguishing *Young v. Harris Health Care, Inc.*, No. 99-30186, 2000 WL 1029180 (5th Cir. July 14, 2000)). On this record, a factfinder could conclude that all of the co-workers who absorbed Flettrich's former duties were outside of his protected class. Since we affirm the district court's judgment on the basis that Flettrich did not present substantial evidence indicating that Chevron's proffered reasons for his termination were a pretext for discrimination, we express no opinion on the state of the law post-*Ernst* and will simply assume that Flettrich established a prima facie case of discrimination.

internal investigation, that Flettrich had violated company policy by using racial slurs—a legitimate, nondiscriminatory reason for Flettrich's termination. As a result, the burden shifted to Flettrich to produce substantial evidence indicating that Chevron's proffered legitimate, nondiscriminatory reason was a pretext for discrimination. *Watkins*, 997 F.3d at 282. "Evidence is substantial if it is of such quality and weight that reasonable and fair-minded men in the exercise of impartial judgment might reach different conclusions." *Laxton*, 333 F.3d at 579 (quotation marks omitted). However, "[i]n cases in which an employer discharges an employee based on the complaint of another employee, the issue is not the truth or falsity of the allegation, but whether the employer reasonably believed the employee's allegation and acted on it in good faith." *Jackson v. Cal-Western Packaging Corp.*, 602 F.3d 374, 379 (5th Cir. 2010) (quotation marks omitted); *see also Harville v. City of Houston, Mississippi*, 945 F.3d 870, 877 (5th Cir. 2019) ("The issue at the pretext stage is not whether the Board's reason was actually correct or fair, but whether the decisionmakers honestly believed the reason."); *Gill v. DIRTT Env't Sols., Inc.*, 790 F. App'x 601, 605 n.2 (5th Cir. 2019) (unpublished) ("However, inaccurate statements are not a basis for finding pretext because the inquiry is solely limited to whether the employer believed the allegation in good faith and whether the decision to discharge the employee was based on that belief.") (quotation marks omitted).

Flettrich did not meet his burden to "adduce evidence supporting an inference that [Chevron's] motive was [race]-based animus, or at the least, that [Chevron's] explanation of its motive [wa]s false." *Sandstad v. CB Richard Ellis, Inc.*, 309 F.3d 893, 899 (5th Cir. 2002). Again, "[t]he issue at the pretext stage is whether [Chevron's] reason, even if incorrect, was the real reason for [Flettrich's] termination[,]" *id.*, so "[t]o the extent that [Flettrich's] summary judgment evidence relates to his innocence of the . . .

charge [that he used racial slurs], it is irrelevant." *Waggoner v. City of Garland, Texas*, 987 F.2d 1160, 1166 (5th Cir. 1993); *see also Jackson*, 602 F.3d at 379 ("His own conclusory assertion that he did not behave inappropriately is irrelevant, since he has provided no evidence to suggest that Cal-Western's decision to trust the results of the two investigations, rather than his self-serving denial of wrongdoing, was unreasonable or in bad faith.").

Evidently mindful that he cannot create a triable fact issue solely with his claims that he "has never used the '[n]-word' in any setting," Flettrich impugns the methodology used by Trader; he argues that Trader "conduct[ed] his entire investigation over the phone while sitting at a desk in Houston" and "did not follow Chevron's standard investigatory practices[.]" But Flettrich does not point to evidence showing that Trader, for instance, fabricated witness interviews. Put another way, Flettrich does not point to evidence establishing that the people to whom Trader spoke did not say what Trader said they did. Instead, Flettrich argues (through statements like, "The spreading of a false accusation to your close friends does not make the false accusation any truer") that Trader should not have believed what he was told and, by extension, that Trader intentionally gave credence to witnesses who were not credible so that Chevron would have a pretext to fire Flettrich. In that vein, Flettrich goes so far as to suggest that Ockmand's and Peco's statements did not constitute evidence that he had ever used racial slurs. The argument, in short order, becomes circular: Flettrich apparently knows that his insistence that he has never used racial slurs will not create a triable issue of fact, so he claims that Trader's investigation was a sham—but the only evidence that he cites, aside from unsupported speculation that Chevron had "set goals to increase the number of minorities in supervisory positions at the expense of Whites" to quell "racial tensions and divides in the nation[,]" is his insistence that he has never used racial slurs.

Moreover, testimony given under oath in this lawsuit is consistent with accounts documented by Trader. For example, Johnson, an African-American whom Flettrich describes as a "friend[]" and who testified that he never heard Flettrich use the n-word and that he did not consider Flettrich a racist, confirmed in his deposition that Ockmand told Johnson that Flettrich had made "a statement about race" that had upset Ockmand. Johnson's deposition testimony was consistent with what he had told Trader, and Johnson further confirmed in his deposition that Trader took accurate notes of their conversation and did not question him in a leading or suggestive manner.

Flettrich does not provide any evidence showing that Chevron did not believe that he had used racial slurs or that Chevron acted unreasonably or in bad faith when it decided to trust the results of its investigation into the allegations against him. The district court did not err when it granted Chevron's motion for summary judgment.[3]

## CONCLUSION

We AFFIRM the district court's judgment.

---

[3] Although the parties do not devote much briefing to the issue, Flettrich also filed a motion to amend judgment under Federal Rule of Civil Procedure 59(e). The district court denied the motion with a thorough opinion. We review the district court's denial of Flettrich's Rule 59(e) motion for an abuse of discretion. *Advocare Int'l, LP v. Horizon Lab'ys, Inc.*, 524 F.3d 679, 690–91 (5th Cir. 2008). "A Rule 59(e) motion must clearly establish either a manifest error of law or fact or must present newly discovered evidence and cannot raise issues that could, and should, have been made before the judgment issued." *Id.* at 691 (footnotes and quotation marks omitted). Having reviewed the record and the parties' briefing, we conclude that the district court did not abuse its discretion in denying Flettrich's Rule 59(e) motion.