# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**F I L E D**
July 8, 2011

Lyle W. Cayce
Clerk

No. 10-60095

GEORGE DULIN,

Plaintiff - Appellant,

v.

BOARD OF COMMISSIONERS OF THE GREENWOOD LEFLORE
HOSPITAL,

Defendant - Appellee.

Appeal from the United States District Court
for the Northern District of Mississippi

Before BARKSDALE, CLEMENT, and PRADO, Circuit Judges.

EDITH BROWN CLEMENT, Circuit Judge:

George Dulin formerly served as the attorney for the Board of
Commissioners (Board) of the Greenwood Leflore Hospital (Hospital). When the
Board terminated his contract, Dulin filed suit alleging race discrimination. The
case proceeded to a jury trial. After Dulin presented his case, the Board moved
for, and the district court granted, judgment as a matter of law under Federal
Rule of Civil Procedure 50. Dulin appeals and we AFFIRM.

## FACTS AND PROCEEDINGS

Dulin, who is white, worked as the Board's attorney for twenty-four years.
The Board unanimously voted to remove him in August 2006, although it kept

10-60095

him in his position with pay until April 2007. The Board hired W. M. Sanders, a black woman as board attorney in January 2007. She officially began work in February 2007. The Hospital is jointly owned by Leflore County, Mississippi and the City of Greenwood, Mississippi. When it terminated Dulin's contract, the Board's members were Gladys Flaggs, Walter Parker, Sammy Foster, Alex Malouf, and Bryan Waldrop. Flaggs, Parker, and Foster are black. Malouf and Waldrop are white. Three of the Board's members—Flaggs, Parker, and Waldrop—were appointed by the Leflore County Board of Supervisors; two—Foster and Malouf—were appointed by the Greenwood City Council.

The Greenwood Voters' League (League) is an organization that advocates for civil rights. Among its members are David Jordan, Robert Moore, and Willie Perkins—a Mississippi state senator, President of the Leflore County Board of Supervisors, and an attorney and President of the local NAACP chapter, respectively. Jordan, then chairman of the League, invited the Board to attend an August 2005 League meeting. Then-chairman of the Board Foster and Board member Malouf attended, accompanied by then-Hospital administrator Jerry Adams. At the meeting, League members advocated for the Board to fire Dulin and hire a black attorney. Bob Darden, a local newspaper reporter, attended the meeting and wrote an article about the events of the meeting (Article), that was published in the Greenwood newspaper the following day.

After his employment concluded, Dulin filed a complaint alleging that the Board had engaged in race discrimination in violation of 42 U.S.C. § 1981.[1] The

---

[1] Dulin also brought claims against Moore for race discrimination under 42 U.S.C. § 1981 and for malicious interference with contract in violation of state law. The district court granted summary judgment to Moore on the § 1981 claim. After Dulin presented his case, Moore moved for judgment as a matter of law on the remaining claim. The district court granted the motion and Dulin did not appeal.

10-60095

Board moved for summary judgment.[2]  The district court denied the motion, remarking that the decision was a "close call," but that it wanted to allow Dulin to present his evidence.  The Board moved in limine to exclude the Article.  The court sustained the motion.  Dulin's § 1981 claim against the Board proceeded to a jury trial.  Dulin presented his own testimony, the testimony of the three black members of the Board, and that of Darden, Adams, Moore, and of Dulin's wife.  After Dulin's attorney informed the court that he intended to rest his case, the Board moved for judgment as a matter of law under Rule 50.  The court granted the motion.  Dulin timely appealed the district court's rulings on the Board's Rule 50 motion and motion in limine to exclude the Article.

## STANDARD OF REVIEW

This court reviews a district court's grant of a motion under Federal Rule of Civil Procedure 50 *de novo*, applying the same legal standard as the trial court.  *Cooper Indus., Inc. v. Tarmac Roofing Sys., Inc.*, 276 F.3d 704, 707 (5th Cir. 2002).  Under Rule 50, a court may grant judgment as a matter of law "[i]f a party has been fully heard on an issue during a jury trial and the court finds that a reasonable jury would not have a legally sufficient evidentiary basis to find for the party on that issue."  FED. R. CIV. P. 50(a)(1)(A)–(B).  The court must draw all reasonable inferences in the nonmovant's favor.  *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000).

A district court's rulings on the exclusion of evidence are reviewed for abuse of discretion.  *United States v. Ragsdale*, 426 F.3d 765, 774 (5th Cir. 2005).  "A trial court abuses its discretion when its ruling is based on an erroneous view of the law or a clearly erroneous assessment of the evidence."  *Id.* (quotation

---

[2] The Board filed a counterclaim against Dulin for attorney malpractice.  The district court granted Dulin's motion for summary judgment on that claim, and the Board did not appeal.

3

omitted). If this court finds an abuse of discretion, it reviews the error under the harmless error doctrine, "affirming the judgment, unless the ruling affected substantial rights of the complaining party." *Id.* at 774–75 (quotation omitted).

## DISCUSSION

### A.   *McDonnell-Douglas* Framework

Employment discrimination claims brought under 42 U.S.C. § 1981 are analyzed under the same framework applicable to claims arising under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.* *Lawrence v. Univ. of Tex. Med. Branch at Galveston*, 163 F.3d 309, 311 (5th Cir. 1999) (citations omitted). This circuit applies a modified *McDonnell Douglas* burden-shifting standard to Title VII claims. *Rachid v. Jack In The Box, Inc.*, 376 F.3d 305, 312 (5th Cir. 2004). This framework requires a plaintiff alleging discrimination to establish a prima facie case by demonstrating that he was: (1) a member of a protected class; (2) qualified for the position in question; (3) the subject of an adverse employment action; and (4) was replaced by someone outside the protected class or otherwise discharged because of his membership in the protected class. *Id.* at 309.

Once the plaintiff establishes a prima facie case, an inference of discrimination arises and the burden shifts to the employer to "articulate a legitimate, nondiscriminatory reason for its decision to terminate the plaintiff." *Id.* at 312. This is a burden "of production, not persuasion." *Reeves*, 530 U.S. at 142. If the employer satisfies this burden, the complainant has the "opportunity to prove by a preponderance of the evidence" that the defendant's reason is not true, but is instead a pretext for discrimination (pretext alternative) or that the defendant's reason, while true, is only one of the reasons for its conduct, and another motivating factor is the plaintiff's protected characteristic (mixed-motive

alternative).  *Id.* (addressing pretext alternative in context of Rule 50 motion); *Rachid*, 376 F.3d at 312 (recognizing pretext and mixed-motive theories); *see also Burton v. Town of Littleton*, 426 F.3d 9, 19–20 (1st Cir. 2005) (addressing Rule 50 motion where plaintiff attempted to prove intentional discrimination by means of mixed-motive theory).  These alternatives are, however, "simply [] form[s] of circumstantial evidence that [are] probative of intentional discrimination."  *Reeves*, 530 U.S. at 147.  "The ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff."  *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253 (1981).

## B.    Dulin's Theories

It is undisputed that Dulin presented a prima facie case of racial discrimination and that the Board asserted a nondiscriminatory reason for terminating his contract, namely its dissatisfaction with his performance as Board Attorney based on his inattention at Board meetings, his failure to proactively offer legal opinions, and its distrust of his legal advice.  It was Dulin's burden to prove that the Board intentionally discriminated against him based on his race by showing that the Board's nondiscriminatory reason was false or by showing that, while the nondiscriminatory reason was true, race was another motivating factor in his termination.  The Board satisfied its burden of production "and the sole remaining issue was discrimination *vel non*."  *Reeves*, 530 U.S. at 143 (internal quotation omitted).  Dulin argued that the three black members of the Board—Flaggs, Foster, and Parker—made a race-based decision about his contract and that the white members of the Board—Malouf and Waldrop—"went along to get along."  Because the Board could only act by quorum—here, three of five members' votes—and the Board's decision to

10-60095

terminate Dulin's contract was unanimous, Dulin needed only to establish that three of the Board members votes were motivated by racial animus.

### 1.     *Dulin's Performance as Board Attorney*

To support his pretext argument, Dulin testified that no Board member had complained to him about his performance. The hospital's former administrator testified that no Board member had raised complaints regarding Dulin's performance, and the reporter testified that the Board members did not complain at the League meeting about Dulin's performance. One Board member testified that he had complained to Dulin at least once about his failure to review the Board's contracts and the Board's desire for Dulin to be proactive about providing the Board with advice. A question of fact exists as to whether or not the Board had expressed concerns about Dulin's performance to Dulin. However, a factual dispute about whether Board members voiced concerns to Dulin is not sufficient to create an issue of material fact regarding whether they were dissatisfied with his performance. Even if the jury were to resolve the disputed question in his favor, it would not be able to conclude that the Board's asserted nondiscriminatory reasons for firing Dulin were false. The relevant testimony and exhibits showed that the five Board members were all, for similar reasons, dissatisfied with Dulin's performance as Board Attorney. Dulin submitted no evidence showing that his legal advice was correct, that the Board was pleased with his advice, or that he was proactive or even attentive at Board meetings.[3] *Cf. Reeves*, 530 U.S. at 144 (discussing petitioner's "substantial showing that respondent's explanation was false" based on evidence that he had properly maintained records and was not responsible for failure to discipline

---

[3] Dulin denied that he fell asleep at Board meetings, but did not address the Board members' other concerns about his performance.

employees).

### 2.    *Remarks at the League Meeting*

Dulin relied on the remarks made by Moore, Foster, and Malouf at the League meeting to show that race was a motivating factor in the Board's decision to terminate his contract.  When evaluating whether race-based comments are sufficient evidence of discrimination, this court has held that:

> [The comments] must be (1) related [to the protected class of persons of which the plaintiff is a member]; (2) proximate in time to the [complained-of adverse employment decision]; (3) made by an individual with authority over the employment decision at issue; and (4) related to the employment decision at issue.

*Jenkins v. Methodist Hosp. of Dallas, Inc.*, 478 F.3d 255, 267 (5th Cir. 2007) (quotation omitted); *Rubinstein v. Adm'rs of Tulane Educ. Fund*, 218 F.3d 392, 400–01 (5th Cir. 2000) (concluding that alleged remarks by individuals affiliated with a hospital did not create a material fact issue on pretext or motivating factor).

None of the comments made at the League meeting meet the second requirement, that of temporal proximity.  The Board decided to replace Dulin in August 2006 and, in January 2007, selected a new Board attorney who began work in February.  The Board continued to pay Dulin in accordance with his contract until April 2007.  Dulin has not argued that comments made in August 2005, one year before the Board decided to replace him and nearly two years before it terminated his contract were "proximate" to the Board's employment decision.[4]  In any event, comments made a year before a plaintiff's termination are not proximate.  *See, e.g.*, *Jackson v. Cal-Western Packaging Corp.*, 602 F.3d

---

[4] Dulin submits that the Board was "still aware" of these comments one year later; he offers no legal argument as to the significance of this "awareness."

374, 380 (5th Cir. 2010).

The comments by Moore and other League members at the League meeting also fail the third prong: requiring the speaker to have "authority over the employment decision at issue." Dulin argues that Moore's comments are relevant because he was capable of influencing the votes of three of the five Board members: Flaggs, Parker, and Foster. Even if the court were to assume that this attenuated connection is legally sufficient and to assume that Moore could influence Flaggs and Parker because he was a member of the Leflore County Board of Supervisors,[5] Dulin presents no basis for Moore's influence over Foster except for the fact that both men are black. The mere fact that individuals share a race is an improper basis on which to stake influence; Dulin's reliance on it is indicative of the weakness of his evidence. Further, Moore's, Flaggs's, Parker's, and Foster's uncontradicted testimony was that neither Moore nor the League (nor anyone else) influenced their decisions.[6] This testimony is corroborated by the statements of all five Board members at the August 2006 Board meeting at which they unanimously agreed to terminate Dulin's contract.[7]

---

[5] This assumption is highly questionable: Moore was merely one of a five-member body that appointed and reappointed Board members by quorum. Dulin presented no evidence that Moore could control the votes of at least two other members of this body or that he did so to influence the decisions of the Hospital Board.

[6] The only evidence relevant to this point was the testimony of Flaggs, Parker, and Foster stating that no one had indicated to them that they might be reprimanded or replaced for any Board decision, including those related to the Board's attorney, that neither Moore nor any other person had threatened any consequences to their decisions as Board members on the Board Attorney or any other topic, that the Board operated with complete independence and authority, and that they would have gladly stepped down if not reappointed.

[7] Dulin offered into evidence a transcript of an audio recording of the Board's August 15, 2006 Executive Session.

10-60095

Finally, even if the court were to assume that the comments made by Board members at the League meeting were both temporally proximate to their decision to terminate Dulin's contract and race based,[8] they would fail the third prong because they could not have been made or adopted by a quorum of the Board (only two Board members attended the meeting). For all of these reasons, none of the comments at the League meeting can show that Dulin's race was a motivating factor in the Board's unanimous decision to terminate his contract.

### 3.    *Other Remarks by Board Members*

Dulin also relied on evidence of comments made by various Board members at occasions outside of the League meeting to show that his race was a motivating factor in the Board's decision. Dulin testified that Malouf approached him the day following the League meeting and stated that Flaggs, Foster, and Parker wanted to replace him. Malouf then suggested that Dulin submit a letter to the Board declaring his intention to retire at some point in the future. Dulin testified that he did submit such a letter and the Board did not respond. Malouf's comments to Dulin were not proximate in time to Dulin's termination. They also fail the first prong of the test because they did not mention race. Next, Moore and Flaggs both testified that they had a conversation approximately three months *prior* to the League meeting in which

---

[8] This is a questionable assumption. The former Hospital administrator testified that Foster informed the League that the Board could not hire a black attorney until there was an opening and could not fire people to create an opening, but that he did not disagree with the suggestion to hire a black attorney. Darden testified that Foster said that the Board did not intend to replace Dulin now, but did intend to do so at some point in the future, and that race should not be a factor. Foster offered similar testimony. Dulin testified that he called Foster after he read the Article and thanked Foster for defending him. Darden also testified that Malouf objected to public discussion of replacing Dulin and stated that the Hospital belonged to the community not the Board or any individual. Malouf offered a similar account.

Moore suggested that the Board replace Dulin. These comments also were not proximate in time to the Board's decisions on Dulin and did not include any mention of Dulin's race. Moreover, Flaggs did not respond to, much less agree to implement, Moore's suggestion. Similarly, Moore and Parker testified that they had a very similar conversation approximately three months *after* the League meeting. Moore's comments and Parker's non-response were not proximate in time to the Board's employment decision and did not mention race. Neither Flaggs nor Parker attended the League meeting and Dulin offered no other evidence that their decisions to terminate Dulin's contract were motivated by racial animus.

Finally, all five Board members discussed Dulin at the August 2006 Board meeting and decided that he should resign or retire within thirty to ninety days. Their comments, while proximate in time, fail the first prong of the test because the only statements that relate in any way to race expressed that: (1) the League was out of bounds in requesting that the Board fire Dulin; (2) the Board should not have fired Dulin after the League meeting; (3) the League has its own agenda; (4) the League had no influence over the Board's decisions; (5) the League had treated the Board members badly at that meeting; and (6) the Board members would not be returning to League meetings.

### 4.    *No Evidence of Intentional Discrimination*

In sum, Dulin did not meet his burden to present legally-sufficient evidence on which the jury could conclude that the Board intentionally discriminated against him based on his race. Because he did not satisfy his burden, the district court properly granted judgment to the Board under Rule 50(a)(1). "Whether judgment as a matter of law is appropriate in any particular

case will depend on a number of factors . . . includ[ing] the strength of the plaintiff's prima facie case, the probative value of the proof that the employer's explanation is false, and any other evidence that supports the employer's case." *Reeves*, 530 U.S. at 148–49. Dulin presented a weak prima facie case and did not satisfy his burden to show that the Board's offered nondiscriminatory justification was false. Where the plaintiff creates "only a weak issue of fact as to whether the employer's reason was untrue and there is abundant and uncontroverted independent evidence that no discrimination had occurred," judgment for the movant is appropriate. *Id.* This is an apt summary of Dulin's case. Judgment as a matter of law for the Board was appropriate.

### 5. *Superior Qualifications*

Dulin's argument that "his qualifications were clearly superior" to those of Sanders was similarly unsupported by the evidence. The bar for showing pretext through superior qualifications is high; "differences in qualifications are generally not probative evidence of discrimination unless those disparities are of such weight and significance that no reasonable person, in the exercise of impartial judgment, could have chosen the candidate selected over the plaintiff for the job in question." *Celestine v. Petroleos de Venezuela SA*, 266 F.3d 343, 357 (5th Cir. 2001) (internal quotation omitted). Dulin elicited testimony that Sanders was an attorney admitted in Mississippi, practicing in Greenwood, that she had been appointed by the Mississippi governor to serve as a state judge for at least one year, that she had possibly worked with the Rural Service. In addition, the three Board members who testified stated that they were pleased with her performance as Board attorney, especially in comparison to Dulin's, because she was much more attentive and proactive about alerting them to

possible legal issues and offering her legal opinion.  Dulin failed to present any other evidence of Sanders's qualifications or lack thereof that would enable the jury to determine that the disparities in qualifications are so significant that no impartial person could have selected Sanders to replace Dulin.  *See id.*

## C.    The District Court Properly Excluded the News Article

Dulin's argument that the district court erred by refusing to admit the Article has no merit.  Newspaper articles are "classic, inadmissible hearsay." *Roberts v. City of Shreveport*, 397 F.3d 287, 295 (5th Cir. 2005).  Dulin sought to admit the Article to prove the truth of the matters asserted in it: that the Board members had made certain statements.  He does not argue that an exception to the hearsay rule applies.  The Article is inadmissable under Federal Rules of Evidence 801(c) and 802.  Further, any hypothetical error in the district court's evidentiary ruling was clearly harmless because Darden, the article's author, testified at trial as to what he observed at the League meeting.

## CONCLUSION

For these reasons, we AFFIRM the district court's resolution of the Board's motions.

RHESA HAWKINS BARKSDALE, Circuit Judge, dissenting in part:

In affirming the Rule 50(a) judgment as a matter of law, the majority holds that Dulin failed to meet his burden to present legally sufficient evidence from which a reasonable juror *could find* that the Hospital Board terminated him because of his race. Because the record reflects that he satisfied that burden, I dissent. (I agree that the district court did not abuse its discretion by not admitting the newspaper article about the 2005 Greenwood Voters' League meeting.)

In the last year of his illustrious life, including extremely distinguished service as a district and appellate judge for our circuit, Judge Alvin B. Rubin observed: "None of us who sit on this court are virgins at the bar". *Munn v. Algee*, 924 F.2d 568, 585 (5th Cir. 1991) (Rubin, J., dissenting). In the light of the trial record and our panel's considerable experience at the trial and appellate levels, it should be quickly apparent that the district court should not have granted relief under Rule 50(a). Instead, the majority strains greatly to shoehorn the trial evidence in its attempt to justify that relief, including applying our court's precedent incorrectly. As is so often the case, when it is necessary to go to such lengths to uphold a Rule 50(a) judgment, it was probably erroneous.

Dulin established a prima facie case, and presented additional evidence, ignored or discounted by the majority, from which a reasonable juror could find that the Board's explanation for terminating him was pretext for discrimination. Credibility determinations and inferences to be drawn from facts, such as the ones presented by the majority in such detail, are, of course, for the jury. They are not to be brushed aside by judgment as a matter of law. The majority renders meaningless Rule 50's reasonable-juror standard. Because of the importance of having a jury decide fact and credibility issues, I urge our court to review this appeal *en banc*, in order to clarify our precedent in employment

13

race-discrimination actions and to give emphasis to the Seventh Amendment right to a jury trial.   U.S. CONST. amend. VII; *see Brown v. Parker Drilling Offshore Corp.*, 444 F.3d 457, 458 (5th Cir. 2006) (Stewart, J., dissenting from denial of rehearing *en banc*) (stating panel majority "usurped the jury's Seventh Amendment function", improperly "replacing the jury's verdict with a verdict of its own").

## I.

In 2007, Dulin filed this action under 42 U.S.C. § 1981 against the Greenwood Leflore Hospital board of commissioners (Board), alleging that the Board terminated him because of his race.  The hospital is owned by the City of Greenwood and Leflore County, Mississippi.  Dulin, who is white, served as Board attorney for 24 years.  At a 2006 Board meeting, the five Board members decided to replace Dulin:  Foster, then chairman; Parker; Flaggs, chairman in January 2007 when the Board selected Sanders as Dulin's replacement; Waldrop; and Malouf.  Foster, Parker, and Flaggs are black, as is Sanders; Waldrop and Malouf, white.  The Leflore County board of supervisors appointed three of the Board members (Flaggs, Parker, and Malouf); the Greenwood city council, two (Foster and Waldrop).  Dulin continued to work for the Board until April 2007.  An amended complaint added Moore (then president of the Leflore County board of supervisors) as a defendant and a state-law malicious-interference-with-contract claim against him.

Dulin alleged:  there were no prior complaints about his job performance; the three black Board members—Parker, Flaggs, and Foster—were motivated by race in deciding to replace him; the two white Board members—Malouf and Waldrop—went along with the decision; three black leaders—Moore, Perkins, and Jordan—pressured the Board to replace him with a black attorney; and Moore influenced the Board by meeting with Board members, urging them to replace Dulin, and falsely accusing Dulin of sleeping at Board meetings.  The

Board counterclaimed for attorney malpractice, and breach of fiduciary duties and of contract.

Dulin moved for summary judgment against the counterclaim; both defendants moved for summary judgment against Dulin's claims. The Board also moved to exclude the newspaper article, written by Darden, who attended the 2005 Greenwood Voters' League meeting and wrote about it.

In 2009, the district court, *inter alia*: granted Dulin summary judgment against the malpractice claim; granted the Board's motion to exclude the newspaper article; granted Moore summary judgment against the § 1981 claim (not challenged on appeal) but denied it for him against the state-law malicious-interference claim (the subsequent judgment as a matter of law against that claim is likewise not challenged on appeal); and, most importantly, denied the Board summary judgment against the § 1981 claim. In denying the Board's summary-judgment motion against that claim, the district court held Dulin had presented sufficient evidence of pretext, creating a "reasonable inference race was a determinative factor in [his] being replaced as Board attorney". *Dulin v. Bd. of Comm'rs of Greenwood Leflore Hosp.*, No. 4:07-CV-194-SA-DAS, at 9 (N.D. Miss. 8 Sept. 2009).

Trial was held on 19-21 January 2010. In addition to his testifying, Dulin called seven witnesses: his wife; Darden; Moore; Adams (by deposition), the white Hospital Administrator who was fired at some point between July and October 2008; and the three black Board members—Parker, Foster (Board chairman at the time of both the 2005 League meeting, which he attended with Adams and Malouf, and the 2006 Board meeting), and Flaggs (Board chairman in January 2007, when the Board selected Sanders). The resulting evidence follows.

The Greenwood Voters' League, a civil rights organization that, *inter alia*, advocates hiring black board members and employees, met in August 2005. Among League members present were: Moore, then president of the Leflore

County board of supervisors; Jordan, then president of the League, state senator, and member of the Greenwood city council, who invited the Board to attend the meeting; and Perkins, then both president of the Leflore County NAACP and county attorney for Leflore County, whose wife then served on the Greenwood city council.  (In addition, Perkins is Moore's attorney for this action.  No attempt was made to preclude that representation.  At trial, Perkins attempted inappropriately to be counsel and witness.  For example, on cross-examination of Darden, Perkins asked the following about the League meeting:  "[D]id you recall whether or not I sought recognition from the [League] president to correct . . . bad legal advice . . . given by Mr. Foster that night?"  Darden answered that he recalled Perkins then stating that the Board could replace the attorney at any time.  Perkins responded:  "[W]as [my question at the League meeting] more like an attorney serves at . . . the will and pleasure of a board?")

Two Board members—Foster (then chairman) and Malouf—and Adams, the Hospital Administrator, attended the League meeting.  (Although, as the majority points out, the district court did not abuse its discretion in not admitting Darden's newspaper article about that meeting, *Maj. Opn.* at 12, those who attended it testified about matters discussed during it.)  Darden and Foster testified:  at the meeting, Moore asked Foster when the Board would replace Dulin with a black attorney.  Darden *and Moore* testified that Foster replied: the change would occur at some point in the future, and it would reflect the opinions of Moore, Perkins, and Jordan.  (This assurance came to fruition a year later.  The admitted-in-evidence transcribed audio recording of the 2006 Board meeting reflects that Foster, then chairman, then recommended Dulin's being replaced.)  Foster also testified that Moore, Jordan, and Perkins expressed strong opinions at the League meeting that they wanted Dulin replaced with a black attorney, to better represent the black-majority population in Greenwood.  Darden also testified that Perkins commented at the meeting that Dulin could be fired at any time, and that there was no discussion of Dulin's job performance.

Moore testified, however, that, at the League meeting, he criticized Dulin's claimed ineffectiveness and sleeping at Board meetings.  Relatedly, Moore also testified:  he was friends with Board members Flaggs and Parker; he had attended approximately two Board meetings a year for approximately five years; and he had spoken informally with Flaggs and Parker before and after the League meeting about replacing Dulin.  Along that line, Parker testified that he was nominated by Moore for the Board (Moore testified that he may have done so); and Flaggs testified that Moore was a member of the Leflore County board of supervisors when she was appointed.

According to Dulin's testimony, after reading Darden's newspaper article about the League meeting, published the next day, he contacted Malouf, who told him he should resign because the Board intended to replace him.  Dulin testified:  he sent his letter of resignation to the Board, but it did not respond.

As noted, one year later, at a Board meeting in August 2006, Foster (then chairman) recommended replacing Dulin.  As also noted, the transcript of the audio recording of that meeting is in evidence.  The Board's explanation for terminating Dulin was that he was sleeping at Board meetings, inattentive, and not providing sound legal advice. (Dulin testified that he did not sleep at Board meetings, and that no Board member had ever complained to him about his performance during his 24 years as Board attorney.  Moreover, there was testimony that the Board never discussed Dulin's claimed poor performance.)  The Board voted unanimously to replace Dulin, admitting at the meeting that "the worst thing [it] could have done [was] come back and fire him at the next meeting [following the 2005 Voters' League meeting]".  In January 2007, when Flaggs was chairman, the Board hired Sanders, a black attorney, to replace Dulin.

At the close of Dulin's case in chief, defendants moved for judgment as a matter of law, pursuant to Rule 50(a).  In granting that relief, the district court ruled, *inter alia*, that there was insufficient evidence regarding Moore's

influencing the Board's decision to replace Dulin with a black attorney. Interestingly, however, in doing so, the court ruled: Foster's comment at the 2005 Voters' League meeting that, "in time, there would be a black attorney", was direct evidence that he harbored racial animus.

## II.

As noted, Dulin does not challenge the Rule 50(a) relief against his state-law claim against Moore. At issue is such relief granted the Board against the § 1981 claim. The majority holds that Dulin did not present legally sufficient evidence from which a reasonable juror could find that the Board intentionally discriminated against him based on race. *Maj. Opn.* at 11. I disagree.

As the majority points out, *id.*, whether judgment as a matter of law is appropriate depends on various factors, including "the strength of the plaintiff's prima facie case, the probative value of the proof that the employer's explanation is false, and any other evidence that supports the employer's case". *Id.* (quoting *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 148-49 (2000)). The trial record reflects that Dulin established a strong (not weak, as the majority opines at 16) prima facie case, and presented substantial evidence from which a reasonable juror could find that the Board's explanation was pretext for discrimination. Accordingly, Dulin's discrimination claim should have been submitted to the jury.

"We review a district court's grant of judgment as a matter of law *de novo*, applying the same standard as the district court." *Laxton v. Gap, Inc.*, 333 F.3d 572, 577 (5th Cir. 2003). Judgment as a matter of law is appropriate only if, after a party has been fully heard on an issue, "a reasonable jury would not have a legally sufficient evidentiary basis to find for the party on that issue". FED. R. CIV. P. 50(a). That occurs when "the facts and inferences point so *strongly and overwhelmingly* in the movant's favor that reasonable jurors could not reach a contrary conclusion". *Palasota v. Haggar Clothing Co.*, 342 F.3d 569, 574 (5th Cir. 2003) (emphasis added) (citation and internal quotation marks omitted).

Reviewing the evidence in its entirety, our court "must draw all reasonable inferences in favor of the [nonmovant]", and "may not make credibility determinations or weigh the evidence". *Reeves*, 530 U.S. at 150. "[T]he court should give credence to the evidence favoring the nonmovant as well as that evidence supporting the moving party that is *uncontradicted* and *unimpeached*, at least to the extent that that evidence comes from *disinterested* witnesses". *Id.* at 151 (emphasis added) (citation and internal quotation marks omitted).

Obviously, Moore, Foster, Flaggs, and Parker were not disinterested witnesses.  In addition, their testimony was contradicted and impeached.

## A.

Plaintiff must prove intentional discrimination by a preponderance of the evidence, using direct or circumstantial evidence. *Desert Palace, Inc. v. Costa*, 539 U.S. 90, 99 (2003). "Direct evidence is evidence which, if believed, proves the fact without inference or presumption." *Jones v. Robinson Prop. Group, L.P.*, 427 F.3d 987, 992 (5th Cir. 2005).  Direct evidence and circumstantial evidence are treated alike; indeed, "[c]ircumstantial evidence is not only sufficient, but may also be more certain, satisfying and persuasive than direct evidence". *Desert Palace, Inc.*, 539 U.S. at 99 (citation and internal quotation marks omitted).

The *McDonnell Douglas* burden-shifting framework, inapplicable if plaintiff produces direct evidence of discrimination, is used to prove discrimination through circumstantial evidence. *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973); *Rachid v. Jack in the Box, Inc.*, 376 F.3d 305, 309 (5th Cir. 2004).  That framework is applied in both Title VII and § 1981 actions. *Mason v. United Air Lines, Inc.*, 274 F.3d 314, 318 (5th Cir. 2001). Under *McDonnell Douglas*, Dulin was required to establish a prima facie case of discrimination by proving:  (1) he was a member of a protected class (reverse discrimination); (2) he was qualified for the position at issue; (3) he was terminated; and (4) the position was filled by someone outside the protected

class. *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 506 (1993); *see also Byers v. Dallas Morning News, Inc.*, 209 F.3d 419, 426 (5th Cir. 2000) (discussing reverse discrimination).

The burden then shifted to the Board to produce a legitimate, nondiscriminatory reason for the employment decision. *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 254 (1981). This is a burden of production, not persuasion. *Id.* The ultimate burden of persuading the trier of fact of intentional discrimination "remains at all times with the plaintiff". *Id.* at 253. It is undisputed that Dulin established a prima facie case and the Board produced a legitimate, nondiscriminatory reason for his termination.

Once the Board satisfied its burden of production, "the *McDonnell Douglas* framework—with its presumptions and burdens—disappeared, and the sole remaining issue was discrimination *vel non*". *Reeves*, 530 U.S. at 142-43 (internal citations and quotation marks omitted). To carry his burden on the ultimate issue of discrimination, Dulin was required to prove, by a preponderance of the evidence, that the Board's claimed legitimate, nondiscriminatory reason was pretext for discrimination. *See id.* at 143. In this instance, because this action was dismissed by judgment as a matter of law at the close of Dulin's case-in-chief, his burden to avoid that dismissal was instead to produce sufficient evidence from which a reasonable juror *could find* intentional discrimination. FED. R. CIV. P. 50(a).

Another method of proof is the mixed-motives method. 42 U.S.C. § 2000e-2(m); *Rachid*, 376 F.3d at 309. A mixed-motives situation "arises when an employment decision is based on a mixture of legitimate and illegitimate motives . . . ." *Rachid*, 376 F.3d at 305 (citation and internal quotation marks omitted). Under § 2000e-2(m), plaintiff "need only present sufficient evidence for a reasonable jury to conclude, by a preponderance of the evidence, that race . . . was a motivating factor for an employment practice". *Desert Palace*, 539 U.S. at 101 (quoting 42 U.S.C. § 2000e-2(m)). Once plaintiff satisfies his burden, it

shifts to defendant "to prove by a preponderance of the evidence that the same decision would have been made regardless of the discriminatory animus". *Jones*, 427 F.3d at 992. Whereas *McDonnell Douglas* "simply involves a shifting of the burden of *production*, [the mixed-motives theory] involves a shift of the burden of *persuasion* to the defendant". *Rachid*, 376 F.3d at 309 (emphasis in original) (quoting *Mooney v. Aramco Servs. Co.*, 54 F.3d 1207, 1216-17 & n.11 (5th Cir. 1995)). Although the mixed-motives method was originally used only in direct-evidence cases, direct evidence is no longer required to obtain a mixed-motives instruction. *Desert Palace*, 539 U.S. at 92.

Post-*Desert Palace*, our court has merged the pretext and mixed-motives approaches. *Rachid,* 376 F.3d at 312. Under our modified *McDonnell Douglas* approach,

> the plaintiff must still demonstrate a prima facie case of discrimination; the defendant then must articulate a legitimate, non-discriminatory reason for its decision to terminate the plaintiff; and, if the defendant meets its burden of production, the plaintiff must then offer sufficient evidence [for a reasonable juror to find] either (1) that the defendant's reason is not true, but is instead a pretext for discrimination (pretext alternative); or (2) that the defendant's reason, while true, is only one of the reasons for its conduct, and another motivating factor is the plaintiff's protected characteristic (mixed-motives alternative).

*Id.* (internal citation and quotation marks omitted).

Because Dulin produced sufficient evidence for a reasonable juror to find pretext, analysis of the mixed-motives approach is unnecessary. In any event, in the light of the trial evidence, Dulin, under the mixed-motives method, can also defeat a Rule 50(a) judgment.

## B.

Applying the modified *McDonnell Douglas* framework, the record reflects there is sufficient evidence from which a reasonable juror *could find* that the

Board's explanation was pretext for discrimination.  After *Reeves,* "when a plaintiff makes a sufficient showing of pretext, no further evidence of discriminatory animus is required to withstand a motion for judgment as a matter of law".  *Laxton*, 333 F.3d at 585.

As stated, this is not a situation where the record conclusively "revealed some other, nondiscriminatory reason for the employer's decision", or where "plaintiff created only a weak issue of fact as to whether defendant's reason was untrue and there was abundant and uncontroverted independent evidence that no discrimination had occurred".  *Reeves*, 530 U.S. at 148.  In concluding that no rational trier of fact could have found Dulin was fired because of race, the majority "impermissibly substituted its judgment concerning the weight of the evidence for the jury's".  *Id.* at 153.  "[B]ased upon the accumulation of circumstantial evidence and the credibility determinations that were required", judgment as a matter of law was inappropriate.  *Russell v. McKinney Hosp. Venture*, 235 F.3d 219, 229 (5th Cir. 2000) (citation and internal quotation marks omitted); *see also Reeves*, 530 U.S. at 148 (holding submission of case to jury appropriate where plaintiff established prima facie case and produced additional evidence from which reasonable juror could find defendant's reason was false).

Dulin produced sufficient evidence of discrimination that was either ignored or discounted by the majority, including:  (1) Foster's and League members' remarks at the 2005 League meeting about replacing Dulin with a black attorney, including League members' influence over the Board's decision; (2) lack of complaints about Dulin's performance; (3) the Board's comments at its 2006 meeting; (4) no objective criteria for selecting Sanders; and (5) no white attorney being considered when Sanders was selected.

**1.**

Extremely compelling for why Rule 50(a) relief was erroneous are the remarks by Foster and League members at the 2005 League meeting.  Remarks "which show on its face that an improper criterion served as a basis—not

necessarily the sole basis, but a basis—for the adverse employment action are direct evidence of discrimination". *Jones*, 427 F.3d at 993 (citation and internal quotation marks omitted).

It goes without saying that, for obvious reasons, direct evidence of discrimination is rare. Viewing the evidence in the light most favorable to Dulin, a reasonable juror could find that Foster's remark at the League meeting was such evidence, *see id.* (finding direct evidence where it proves, without inference or presumption, that race was a factor in employment decision): the League members' desire for a black attorney would eventually be reflected in Dulin's replacement. A year later, at the 2006 Board meeting, Foster, then Board chairman, recommended Dulin's being replaced. The Board hired Sanders, a black attorney, in January 2007. Although Foster's remark qualifies as direct evidence of discrimination, Dulin did not contend that it constituted such evidence. Consequently, it is analyzed as circumstantial evidence.

Whether the remarks by League members also constituted direct evidence of discrimination is less clear, because Dulin must show that a reasonable juror could find that those League members exerted influence over the Board's decision. *See Reilly v. TXU Corp.*, 271 F. App'x 375, 379 n.2 (5th Cir. 2008) ("If we must draw inferences from the evidence, it is circumstantial, not direct."). The majority analyzes the League members' remarks under our court's rigid stray-remarks doctrine. *Maj. Opn.* at 7-8.

Under that doctrine, remarks are evidence of discrimination only if they are: (1) race related; (2) proximate in time to the termination; (3) made by an individual with authority over the employment decision at issue; and (4) related to that decision. *Auguster v. Vermilion Parish Sch. Bd.*, 249 F.3d 400, 405 (5th Cir. 2001). "Comments that do not meet these criteria are considered 'stray remarks', and standing alone, are insufficient" to establish intentional discrimination. *Jackson v. Cal-Western Packaging Corp.*, 602 F.3d 374, 380 (5th Cir. 2010) (internal citation omitted); *see also Turner v. N. Am. Rubber, Inc.*, 979 F.2d 55, 59 (5th Cir. 1992).

In *Reeves*, however, in overturning our court's reversing a jury's verdict (through review of district court's denying judgment as a matter of law), the Supreme Court expressed concern with this test. *Reeves*, 530 U.S. at 151-53 (noting our court's misapplication of Rule 50 standard resulted in discounting critical age-related comments on ground that they were not made in direct context of plaintiff's termination). Rather than applying our court's four-part stray-remarks test, the Court examined the value of the remarks and the speaker. *Id.*; *see also Russell*, 235 F.3d at 225-26 (discussing *Reeves'* admonition to our court for using "harsh lens" of stray-remarks test); *Laxton*, 333 F.3d at 583 (stating remarks must demonstrate discriminatory animus, and be made by person primarily responsible for employment action or by person with influence over formal decisionmakers).

Understandably, post-*Reeves,* our court has taken a more cautious approach to our stray-remarks test, holding that, "so long as remarks are not the only evidence of pretext, they are probative of discriminatory intent". *Palasota*, 342 F.3d at 577-78. Discriminatory comments may create a jury issue, "even if uttered by one other than the formal decision maker, provided that the individual is in a position to influence the decision". *Id.* at 578; *McKinney v. Texas Dep't of Transp.*, 31 F. App'x 152, at *3 (5th Cir. 2001) (emphasis in original) (citation and internal quotation marks omitted); *Santiago-Ramos v. Centennial P.R. Wireless Corp.*, 217 F.3d 46, 55 (1st Cir. 2000).

Drawing all inferences in favor of Dulin, a reasonable juror could find that the remarks by Foster and League members, because of their content, are clearly probative of race discrimination, and that the speakers were either primarily responsible for the employment decision, or exerted influence over the final decisionmakers. *See Russell*, 235 F.3d at 226. The majority states that Dulin needed to establish that at least three of the five Board members were motivated by racial animus; it cites no authority, however, to support this position. *Maj.*

24

*Opn.* at 9. Again, Dulin was required only to produce sufficient evidence from which a reasonable juror could find that the Board's explanation was pretext for discrimination. *Rachid*, 376 F.3d at 312.

### a.

The majority minimizes the significance of evidence regarding Foster's, candid, to say the least, remark at the League meeting. *Maj. Opn.* at 9. As discussed, Darden and Foster both testified that, at the League meeting, Moore asked Foster when the Board would replace Dulin with a black attorney. Darden testified that Foster replied that the Board would accommodate Moore's request at some point in the future. One year later, at the 2006 Board meeting, Foster recommended Dulin's being replaced. In January 2007, the Board hired Sanders, a black attorney, without considering a white-attorney replacement.

A reasonable juror could find that the content of Foster's statement demonstrates racial animus, and the speaker, Foster, as Board chairman, who recommended that Dulin be replaced, was primarily responsible for the employment decision. *See Reeves*, 530 U.S. at 152-53. (In that regard, Adams, the hospital administrator, testified (by deposition): when he began as administrator, Foster told him he "should try to have a more equitable balance of hiring black employees".) The majority relies on: Darden's testimony that Foster also stated at the League meeting that race could not be taken into account; testimony from the three black Board members (Flaggs, Parker, and Foster), denying race-based reasons for terminating Dulin; and testimony from Dulin that he called Foster after the 2005 League meeting to thank him for defending him. *Maj. Opn.* at 8-9.

Darden emphasized in his testimony, however, that Foster also stated at the League meeting that he wanted to make sure that the opinions of Moore, Jordan, and Perkins were "reflected in the selection of a replacement" for Dulin. Moreover, although Dulin admitted he probably called Foster to thank him, he testified that he did so in order "to get along".

Accordingly, drawing all inferences in favor of the nonmovant, a reasonable juror could find that Foster was motivated by race in recommending Dulin's being replaced.

**b.**

The majority holds that remarks by Moore and other League members at the League meeting failed to satisfy two prongs of the stray-remarks test: temporal proximity; and authority over the employment decision. *Id.* at 7-8. As an initial matter, a reasonable juror *could find* these prongs were satisfied. As discussed below, there was sufficient evidence so that a reasonable juror could find that Moore and other League members had influence over the employment decision. Moreover, a reasonable juror could find that the Board's decision to replace Dulin one year after the 2005 Voter's League meeting satisfied the temporal proximity requirement. There was sufficient evidence from the transcript of the 2006 Board meeting so that a reasonable juror could find that the Board *purposely* waited a year to terminate Dulin in order for that decision not to appear to be motivated by race. As discussed *supra*, Malouf stated at that meeting that the worst thing the Board could have done was terminate Dulin directly after the 2005 League meeting. A reasonable juror could make the same inference about the Board's not responding to Dulin's 2005 resignation letter.

In strictly applying the stray-remarks test, however, the majority ignores the Supreme Court's holding in *Reeves* and discounts probative evidence of discrimination. Again, post-*Reeves*, our court has retreated from the stray-remarks doctrine, and now looks only at the content of the remarks and the speaker. Remarks may be probative even "where the comment is not in the direct context of the termination and even if uttered by one other than the formal decision maker", as long as that individual influenced the employment decision. *Palasota*, 342 F.3d at 578. Moreover, the comments at the League meeting are not the *only* evidence of pretext. *See id.* at 577 (noting that there must be other evidence of pretext for comments to be analyzed under *McDonnell*

*Douglas* framework).  As discussed below, the League members' remarks were sufficient for a reasonable juror to find:  the remarks' content demonstrated racial animus; and, those members influenced the employment decision.

### i.

A reasonable juror could find that the League members' remarks are probative of the Board's discriminatory intent because their content reflected racial animus.  As noted *supra*, Darden and Foster both testified that, at the League meeting, Moore asked Foster when the Board would replace Dulin with a black attorney.  Foster also testified that Moore, Perkins, and Jordan were advocating replacing Dulin with a black attorney.  Adams testified (by deposition) that it was clear at the League meeting that those three members were advocating the replacement of Dulin with a black attorney.

### ii.

Next, a reasonable juror could find that Dulin produced sufficient evidence that Moore, Perkins, and Jordan, although not formal decisionmakers, exerted influence over the employment decision.  "Cat's paw" is one method of imputing discriminatory animus to the ultimate decisionmakers.  *Laxton*, 333 F.3d at 584; *Russell*, 235 F.3d at 227.  Dulin's attorney stated at trial that a cat's-paw situation does not directly apply; the majority does not address it.

Although cat's paw has generally been applied where co-workers display discriminatory animus, it also applies where defendant is influenced by someone outside the workplace.  "[R]emarks by those who did not independently have the authority or did not directly exercise their authority to fire the plaintiff, but who nevertheless played a meaningful role in the decision to terminate the plaintiff, [are] relevant".  *Ercegovich v. Goodyear Tire & Rubber Co.*, 154 F.3d 344, 354-55 (6th Cir. 1998); *see also Russell*, 235 F.3d at 226-27 (holding if plaintiff shows others had influence over decision, it is proper to impute their discriminatory motives to formal decisionmakers) (citing *Long v. Eastfield Coll.*, 88 F.3d 300, 306-07 (5th Cir. 1996)).

A cat's-paw situation occurs where defendant's employment decision is influenced by other individuals harboring racial animus, "the term being derived from the fable regarding a monkey's using a cat's paw to remove chestnuts from a fire". *Hervey v. Miss. Dep't of Educ.*, 404 F. App'x 865, 871 (5th Cir. 2010). The Supreme Court recently addressed the cat's-paw theory in *Staub v. Proctor Hosp.*, 131 S. Ct. 1186, 1194 (2011), holding: where a non-decisionmaker performs an act motivated by unlawful reasons, that is intended to cause an adverse employment action, and such act is a proximate cause of the employment action, defendant is liable.

A reasonable juror could find: the League members intended their remarks to cause Dulin's termination; and, those remarks influenced the Board's decision. The majority states that Moore had only an "attenuated connection" with Flaggs and Parker (two black Board members who did not attend the League meeting), *Maj. Opn.* at 8; however, Moore testified that he spoke individually with Flaggs and Parker (his friends) before and after the League meeting about replacing Dulin. This evidence is significant because there was: testimony that Moore was advocating hiring a black Board attorney; and, a transcript of the January 2007 Board meeting where the Board, with Flaggs as chairman, decided to hire Sanders, a black attorney.

In addition, although Moore testified that he spoke with Flaggs and Parker about replacing Dulin, he also testified that no Board member had complained to him about Dulin's alleged sleeping at Board meetings prior to Moore's suggesting it at the League meeting as a reason to replace Dulin. As noted, Moore testified that he attended approximately two Board meetings per year. Parker testified: Moore told him there were others who could do the job of Board attorney; and Parker did not know the context of Moore's statement, except that he knew it did not arise out of his (Parker's) complaining to Moore about Dulin. The three black Board members denied being influenced by the League; but, in the light of the trial evidence, that, obviously, is a credibility issue for the jury.

Moreover, Parker and Flaggs were two of three Board members appointed by the Leflore County board of supervisors, of which Moore was then president. (Parker testified that he was nominated by Moore; Flaggs testified that she thought she was nominated by Moore, who was on the Leflore County board of supervisors when she was appointed, but was unsure.) The board of supervisors was also responsible for those three members' reappointment (for the Leflore County board of supervisors, three votes were required to remove a Board member; for the city council, four votes were required). Because the Greenwood Hospital is owned by the City and County, the Board effectively serves them.

The majority states: even if it is assumed that Moore influenced Flaggs and Parker, there was no evidence that Moore influenced Foster. *Id.* I disagree. Foster testified that he felt pressure from Moore and the League to replace Dulin with a black attorney. Despite that admission, the majority relies on what it terms "uncontradicted testimony" by Flaggs, Parker, and Foster, that neither Moore nor the Voters' League influenced their decisions. *Id.* In any event, Dulin presented sufficient evidence to create a jury issue on whether the Board members were influenced by Moore and other League members in their termination decision. "Emanating from a source that influenced the [employment] action . . . , the derogatory comments became evidence of discrimination . . . ." *Hunt v. City of Markham*, 219 F.3d 649, 653 (7th Cir. 2000) (internal citations omitted).

**2.**

The Board asserted that it terminated Dulin because of his: inattentiveness and sleeping at Board meetings; failure to be proactive at Board meetings, including not reviewing contracts; and providing improper legal advice. *Maj. Opn.* at 5. Foster testified that Dulin was not reading contracts. Parker testified that Dulin gave him improper legal advice about whether his wife could continue working at the Hospital after Parker's appointment to the Board.

Dulin also produced sufficient evidence creating an issue for the jury on whether there were complaints regarding his performance.  A reasonable juror could have found, based on the lack of complaints regarding Dulin's performance, that the Board's explanation was pretext for discrimination.  The majority improperly holds that lack-of-complaint evidence was insufficient to show that the Board's reasons were pretextual.  It noted: "[a] question of fact exists as to whether or not the Board had expressed concerns about Dulin's performance to Dulin"; but, even if the jury resolved that question in Dulin's favor, it could not conclude that the Board's explanation was pretextual.  *Id.* at 6.  Again, I disagree.   Not only was there testimony that no Board members complained to Dulin, there was also evidence that the Board never discussed Dulin's claimed poor performance.  This lack-of-complaint evidence, combined with other evidence of discrimination, was sufficient so that a reasonable juror could find the Board's explanation was pretext for discrimination.  *Reeves*, 530 U.S. at 148. Whether Board members complained to Dulin about his performance is a credibility issue for the jury.

The majority relies on Foster's testimony that he spoke with Dulin about his giving improper legal advice.  *Maj. Opn.* at 6.  Dulin testified, however, that during his 24 years as Board attorney, no Board member had ever complained to him about his performance.  In fact, he was unaware the Board was considering replacing him until he read Darden's newspaper article about the League meeting.  Further, Parker testified that he voted to replace Dulin because Dulin gave him improper legal advice, but admitted that he never complained to Dulin about that advice or made any complaints to Dulin about his performance. *See Laxton,* 333 F.3d at 581 (noting that supervisors' failure to discuss performance-related problems with plaintiff undermines credibility of defendant's explanation for discharge).  Flaggs also testified that she never told Dulin that there was a problem with his performance.

There was also evidence that the Board never discussed Dulin's claimed poor performance. According to Parker's testimony, the Board never discussed Dulin's claimed sleeping at Board meetings, and he never criticized Dulin's performance while attending those meetings. (Parker also testified that no one from the community ever complained about Dulin's performance.) Flaggs testified: she never told the Board she had a problem with Dulin's performance; the Board never discussed in detail any reasons for firing Dulin; and she had no knowledge of the claimed unsound legal advice given to Parker. Finally, Adams testified (by deposition) that he never complained about Dulin and never received any questions from the Board regarding Dulin's performance. (As discussed, Darden testified that, at the League meeting, there were no complaints about Dulin's performance or any reasons given for why he should be replaced.)

**3.**

The majority also discounts evidence concerning the 2006 Board meeting, *Maj. Opn.* at 10, from which a reasonable juror could find that the Board took race into account in deciding to replace Dulin. As stated, the transcript of the audio recording of this meeting was admitted in evidence.

At the 2006 Board meeting, where the decision was made to replace Dulin, Malouf stated that, replacing Dulin soon after the 2005 League meeting, would have been "the worst thing" the Board could do, implying that race was a factor in the Board's decision to replace Dulin. Foster agreed with Malouf. At the very least, a reasonable juror could find that the Board was still concerned about racial comments made at the League meeting, which could be viewed as the real reason for replacing Dulin.

Along that line, Moore testified that he suggested to the Board—in his conversations with Flaggs and Parker, and at the 2005 League meeting—that the Board terminate Dulin because of his claimed inattentiveness and sleeping at Board meetings. Moore further testified that he made that suggestion

because the Board was afraid that its replacing Dulin would appear to be racially motivated in the light of the Board's not seeing itself as having a reason to replace him. The Board did not decide on Sanders as the replacement until January 2007, when Flaggs was chairman. Again, this evidence, combined with other evidence of pretext, was sufficient so that a reasonable juror could find that Dulin was terminated because of his race.

**4.**

Moreover, Dulin produced evidence on the Board's unawareness of Sanders' qualifications for the Board-attorney position. The majority characterizes this as "superior-qualifications" evidence. *Id.* at 11-12. Although Dulin maintains, in his brief to our court, that he had superior qualifications, he also contends that Board members were unaware of Sanders' qualifications and knew only that she was a licensed attorney.

I disagree with the majority that we must apply the superior-qualifications test. Rather, a reasonable juror could find that the Board's lack of knowledge regarding Sanders' qualifications and evidence that there were no objective criteria for the position provided a basis so that a reasonable juror could find that the Board's explanation was pretext for discrimination.

The selection process involved a nomination and five Board members voting. Both Parker and Flaggs testified that the Board did not discuss any objective qualifications for a replacement. They testified further that there were no special qualifications for the position other than having a law degree. Specifically, Flaggs, Board chairman when Sanders was selected, testified: "The board did not have any criteria set before [it] to say what [Board members] were looking for". Flaggs also testified that she did not receive any recommendations for Sanders, although she had received good recommendations for Perkins as a possible replacement. Parker testified that he knew only that Sanders was a licensed practicing attorney, and that there were no objective criteria for choosing a replacement.

The majority relies on the following testimony regarding Sanders' qualifications:  Dulin's testimony that Sanders was appointed by the Governor of Mississippi to serve as a judge for one year while an elected county judge was on suspension; and Foster's testimony that he knew Sanders had been appointed by the Governor and that she had served in other high positions, including at Rural Services.  *Id.*  As discussed, however, those qualifications were not discussed by the Board or ever considered in its decision to select Sanders as Dulin's replacement.

Similarly, the majority improperly relies on testimony that, after hiring Sanders, the Board was pleased with her performance as its attorney.  *Id.* at 12.  Obviously, examining whether Sanders was qualified for the job *after* she was selected is irrelevant.  At issue is whether the Board knew about Sanders' qualifications *before* it hired her, bearing on whether a reasonable juror could find that the Board's explanation was pretext for discrimination.

**5.**

Dulin also produced evidence on whether the Board seriously considered any white attorneys as a replacement.  The majority does not address this evidence.  Parker and Foster testified that Malouf recommended a highly qualified white attorney replacement to the Board, but that Malouf's recommendation was never formally nominated.  According to the in-evidence transcript of the January 2007 Board meeting and Foster's testimony, the only other candidate whose resume was considered was black.  Foster and Flaggs testified that no white attorney replacement was discussed.

Moreover, Parker testified that, in a discussion with Moore prior to the 2005 League meeting about replacing Dulin, Moore stated there were others who could perform as Board attorney.  Dulin's attorney also impeached Parker with his deposition testimony, in which he stated that Moore had expressed an interest in having one of his friends as Board attorney.  Again, it is the accumulation of circumstantial evidence of pretext, and the credibility

determinations that were required, that rendered judgment as a matter of law inappropriate.

## C.

Drawing all reasonable inferences in Dulin's favor, my reading of the record convinces me that defendants are *not* entitled to judgment as a matter of law. Again, the issue is *not* whether Dulin satisfied his ultimate burden of proving intentional discrimination; whether defendants were motivated by race is for the jury to decide. *St. Mary's Honor Ctr.*, 509 U.S. at 518. The issue is whether Dulin produced sufficient evidence from which a reasonable juror *could find* intentional discrimination, so that the jury would be ultimately permitted to decide the claim after completion of the balance of the trial, including receiving jury instructions and hearing closing arguments.

Again, Dulin produced substantial evidence of discrimination, including, *inter alia*: Foster's remark that, in the future, the Board would replace Dulin with a black attorney; remarks by League members advocating the replacement of Dulin with a black attorney; League members' influence over the Board's decision; lack of complaints regarding Dulin's performance; Board members' comments at its 2006 Board meeting; no objective criteria for hiring Sanders; and no white attorney's being considered for the position. This evidence, combined with Dulin's prima facie case, was sufficient so that a reasonable juror could find that the Board's explanation was pretext for discrimination. *See Reeves*, 530 U.S. at 148.

## III.

Because, in the light of the trial evidence, a reasonable juror *could find* Dulin was terminated because of his race, I respectfully dissent. Moreover, in order to emphasize proper application for granting judgment as a matter of law at the conclusion of plaintiff's case-in-chief, and to clarify our precedent for its application in discrimination actions, our court is urged to consider this matter *en banc*.